**WEST TEXAS TRANSMISSION, L.P.,
Plaintiff–Appellant,**

**v.**

**ENRON CORPORATION, et al.,
Defendant–Appellees.**

**No. 89–5512.**

United States Court of Appeals,
Fifth Circuit.

Aug. 9, 1990.

Rehearing and Rehearing En Banc Denied
Sept. 17, 1990.

Rufus Wallingford, Layne E. Kruse, Houston, Tex., Richard J. Zook, Dan Matthews, San Antonio, Tex., for plaintiff-appellant.

Richard P. Keeton, Mayor, Day & Caldwell, Houston, Tex., for TECO and NTIPC.

David T. Harvin and Karl S. Stern, Vinson & Elkins, Houston, Tex., for Enron Corp.

Wistanley F. Luke, U.S. Atty., San Antonio, Tex., David C. Shonka, Jerold D. Cummins, FTC, Washington, D.C., for F.T.C.

Before CLARK, Chief Judge, THORNBERRY and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

West Texas Transmission, L.P.. ("Valero") appeals from the district court's order denying specific performance of Valero's right of first refusal to repurchase from Enron Corporation and Northern Texas Intrastate Pipeline Company ("Enron") a one-half interest in the TransTexas Natural Gas Pipeline. After a bench trial, the district court found that, as a prerequisite to Valero's pipeline acquisition, the stock pur-

chase agreement between Valero and Enron required Valero to receive FTC approval of the purchase. Further, according to the court, the FTC possessed statutory authority to implement the initial consent decree with Enron, requiring Enron to receive FTC consent for any pipeline sale, and subjecting Valero, an independent third party, to FTC authority. Valero challenges both of these rulings. We affirm.

## BACKGROUND

From 1969 until 1985, Valero Transmission Company, a predecessor of West Texas Transmission, L.P., constructed and operated the TransTexas Natural Gas Pipeline between Waha and New Braunfels, Texas. This pipeline carried natural gas from production areas in the Permian Basin to the region in and around New Braunfels, Valero's major market. The pipeline also merged with a network of pipelines serving the Gulf Coast.

In 1985, Valero's traditional markets vanished due to an oversupply of natural gas. To replace its diminished sales, Valero elected to increase its Gulf Coast operations. Although Valero owned pipeline facilities servicing Texas' industrial areas, Valero lacked both the capital to expand its operations, and ready access to a long-term supply of natural gas. Valero eliminated these impediments on February 28, 1985, by initiating a joint venture, the Nor–Val partnership, with NorTex, a wholly-owned subsidiary of Internorth, Inc. NorTex possessed an abundance of low-priced natural gas in the Midwest's Huken field area, but lacked a pipeline network to transport this gas to Houston. In exchange for a one-half interest in Valero's pipeline, NorTex contributed its long-term supply of natural gas and enough working capital to finance the enterprise.

The parties memorialized their arrangement in an Ownership Agreement. Under Article IX, section 9.1 of this contract, both parties retained a right of first refusal to repurchase the pipeline if either party should choose to sell its undivided half interest. The parties forwarded their agreement to the FTC as part of their Hart–Scott–Rodino filing. When the FTC took no action to inhibit the sale, the partnership began operations.

Two months later, Internorth, NorTex's parent company, merged with Houston Natural Gas to form Enron, Inc.[1] Houston Natural Gas ("HNG"), one of Valero's principal competitors, held a 50% interest in the Oasis pipeline, which paralleled the Nor–Val pipeline route. Believing that this acquisition by Internorth violated NorTex's fiduciary duties to Valero under the Ownership Agreement, and that it raised serious antitrust concerns, Valero filed suit in federal court to block the merger. Valero also alerted the FTC to the potential anticompetitive effects of Internorth's acquisition.

Valero and Enron resolved their dispute on May 28, 1985 by signing a Settlement and Indemnity Agreement. NorTex consented to sell its one-half interest in the pipeline to an Acceptable Purchaser. Valero retained the right to disapprove of any pipeline purchaser tendered by NorTex, and reaffirmed its right of first refusal, originally secured under the Ownership Agreement. Both parties covenanted to use their best efforts to locate a prospective partner for Valero.

Meanwhile, the FTC elected to investigate the Internorth/HNG merger under both Section 7 of the Clayton Act (15 U.S.C. § 18) and Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45). *In re InterNorth, Inc.*, 106 F.T.C. 312, 317 (1985). Determining that the affiliation raised concerns under the antitrust laws, the FTC formulated a consent decree with Internorth and HNG permitting the merger to proceed if the parties divested themselves of certain assets and dissolved particular contracts. The decree listed "[t]he fifty percent (50%) undivided interest in the TransTexas Pipeline that was acquired pursuant to the Purchase Agreement, dated as of February 28, 1985" among Internorth's

---

1. For purposes of this opinion, we will refer to the defendants, Enron Corporation and its sub-

sidiary Northern Texas Intrastate Pipeline Company collectively as "Enron."

assets to be sold. *In re InterNorth, Inc.,* 106 F.T.C. at 323, Schedule A.

The order also provided that Internorth could divest itself of the itemized assets "only to an acquirer or acquirers, and only in a manner that receives the prior approval of the Federal Trade Commission." *In re InterNorth, Inc.,* 106 F.T.C. at 319. *See* "Analysis to Aid Public Comment", 50 Fed. Reg. 25235, 25258 (to be codified at 16 C.F.R. pt. 13) (proposed June 18, 1985). The FTC retained this approval power to guarantee that any divestiture would effectuate the purposes underlying the decree: "to ensure the continuation of the assets as ongoing, viable enterprises engaged in the same business in which the Properties are presently employed and to remedy the lessening of competition resulting from the Acquisition as alleged in the Commission's complaint." *In re InterNorth, Inc.,* 106 F.T.C. at 319.

Despite the mandatory divestiture and approval provisions of the consent decree, the FTC's order did not mention Valero's right of first refusal over the pipeline. The FTC knew that Valero received this right from Internorth under the Ownership Agreement. Further, Valero first brought the antitrust ramifications of the Internorth/HNG merger to the FTC's attention. Nevertheless, the FTC did not invite Valero to participate in the negotiations underlying the document, or make Valero a party to the final decree.

Before issuing its final order, the FTC published the proposed consent decree in the Federal Register, and instituted a 60-day notice and comment period. 50 Fed. Reg. 25235, 25258 (to be codified at 16 C.F.R. pt. 13) (proposed June 18, 1985). The FTC also widely disseminated press releases delineating the contents of the decree and inviting interested parties to submit criticisms. Valero received actual notice of the consent decree's divestiture and approval requirements. However, Valero elected not to oppose the terms of the order, to propose revisions, or to seek an exemption from the FTC approval process. Upon receiving no response to these publications, the FTC issued its formal complaint and decision on September 30, 1985, permitting the merger contingent upon the requisite divestitures. *In re InterNorth, Inc.,* 106 F.T.C. at 312. Enron began to solicit prospective purchasers for its assets.

In the meantime, Valero sought to reorganize and refinance its internal operations by assigning its own pipeline interest to Valero Natural Gas Partners, L.P., a related entity. Enron threatened to block this assignment by exercising its right of first refusal. On March 24, 1987, the parties executed the TransTexas Settlement Agreement to resolve this and other continuing pipeline disputes. Modifying the 1985 Settlement and Indemnity Agreement, this contract eliminated Valero's veto rights over any pipeline purchaser tendered by NorTex. It also restructured Valero's right of first refusal, allowing Valero to repurchase the pipeline only if the prospective independent purchaser offered less than forty million dollars.

This settlement agreement permitted Valero to proceed with its reorganization. Although Valero Natural Gas Partners, L.P. initially received the right of first refusal, it reassigned the right to Valero NorTex L.P., another Valero affiliate, in September, 1987. Eight months later, Valero NorTex L.P. changed its name to West Texas Transmission, L.P., the plaintiff in this suit.

During Valero's reorganization period, Enron negotiated to sell 100% of its NorTex stock, including its pipeline interest, to TECO Pipeline Company. The parties executed informal letter agreements on July 15, 1987, and signed the Stock Purchase Agreement on July 30, 1987. The agreement expressly conditioned consummation of the sale on FTC approval under the consent order, and on Valero's decision not to exercise its first refusal rights. If the FTC failed to act in a timely fashion, the agreement would expire by its own terms on October 15, 1987. Enron formally requested the FTC to approve TECO's acquisition on July 23, 1987.

Enron also promptly informed Valero about the terms and conditions of the proposed sale to TECO. By letter dated September 8, 1987, Valero elected to exercise

its right of first refusal to repurchase the pipeline "under the same terms and conditions as agreed to by TECO and Enron." On September 11, 1987, Enron and Valero executed the same Stock Purchase Agreement that TECO had signed, replacing TECO's name with Valero's, applying relevant provisions to Valero rather than to TECO, and advancing the involuntary termination date to November 27, 1987. Valero's agreement also contained the FTC approval requirement as a condition precedent to consummation of the deal. Valero never objected to this prerequisite. On September 22, 1987, Enron asked the FTC to approve this divestiture to Valero.

While the FTC scrutinized the approval requests, Valero lobbied the FTC for confirmation of Valero's repurchasing plan, and for a modification of the Enron/Valero agreement. Under the original Enron/TECO contract, TECO appointed Enron as its agent to negotiate and execute all agreements for the transportation of natural gas through the TransTexas Pipeline. Enron would subject all third-party gas carried by the pipeline to the TransTexas tariff, creating an artificially high minimum price for the fuel. This same arrangement, if applied to Valero, would prevent Valero from competitively pricing its gas in the San Antonio market. On September 18, 1987, Valero met with the FTC to discuss this arrangement. Approximately three weeks later, Valero wrote a letter to the FTC describing additional ramifications of this proposal, and encouraging the FTC to approve Valero as a purchaser while rejecting the agency agreement. The FTC failed to take any action on the approval requests, and both purchase contracts terminated.

At this stage, Valero bargained with Enron for a direct purchase of the pipeline. After the parties reached an apparent accord, Enron informed Valero that it would not proceed with the transaction. Apparently, the FTC had advised Enron that it might disallow Valero's repurchase.[2] For

the first time, Valero expressed its belief that the FTC lacked jurisdiction under the consent decree to review Valero's acquisition.[3] Nevertheless, Enron terminated its discussions with Valero, and pursued another purchase agreement with TECO.

Enron and TECO signed this second Stock Purchase Agreement on January 28, 1988. As with the first agreement, the parties subjected this second deal to an FTC approval requirement, and to Valero's decision not to exercise its first refusal rights. Enron submitted TECO's second contract to the FTC for approval on February 2, 1988.

Enron also divulged the terms and conditions of the second TECO contract to Valero, at which time Valero elected to repurchase the pipeline. Valero and Enron executed an interlineated copy of the second TECO agreement on March 29, 1988. Two separate provisions of this contract incorporate the FTC approval requirement as a prerequisite for the deal. Section 1.07 provides:

> 1.07 *Seller's Conditions to Closing.* The obligations of Seller to proceed with the closing are subject, at the option of Seller, to the satisfaction of the conditions that ... (iii) all approvals relating to the Federal Trade Commission Decision and Order re Internorth, Inc. (Docket C–3168) issued September 30, 1985, insofar as it relates to the System (as defined in this Agreement) shall have been obtained.

Similarly, section 1.09 states:

> 1.09 *Termination.* This Agreement shall terminate automatically (i) if the FTC disapproves or rejects Seller's divestiture of Company to Buyer, or (ii) if FTC approval of Buyer has not been received by December 31, 1988 ...

Despite this unambiguous language, Jack Spinks, Vice President for Valero, submitted a contemporaneous letter to En-

---

**2.** 8 Trial Transcript at 53; Letter from Palmer L. Moe, President of Valero, to Louis Potempa, Vice President for Enron (January 25, 1988) (discussing second proposed sale to TECO).

**3.** Letter from Palmer L. Moe to Louis Potempa (January 25, 1988).

ron in which he attempted to undermine these provisions:

> This will serve to advise you that it is the position of Valero NorTex that the provisions of the Purchase Agreement do not in any way change, amend, modify, restrict or limit Valero NorTex' right of first refusal with respect to the . . . interest in the TransTexas pipeline system owned by Northern Texas. . . . [I]t is the position of Valero NorTex that the disapproval or rejection by the F.T.C. of Valero NorTex' purchase will not operate to terminate such right of first refusal and such right will continue in full force and effect, notwithstanding any approval by F.T.C. of the similar Purchase Agreement with TECO.

Letter from Jack Spinks, Vice President for Valero NorTex L.P. to Enron Corp. (March 29, 1988). None of Enron's officers signed this letter or incorporated it as part of the second agreement.

Furthermore, both before and after executing this contract, Valero, and its Vice President Jack Spinks, embraced the opposite position. In letters forwarding information to companies interested in purchasing Enron's one-half interest from Valero once Valero completed the repurchase, Spinks admitted that Valero's acquisition was subject to FTC approval.[4] Valero made the same admission in its 10–K filing before the Securities and Exchange Commission, and in the affidavit accompanying its Hart–Scott–Rodino filing before the FTC.[5]

Valero also actively participated in the FTC approval process. Prior to signing the second agreement, Valero met with the FTC to discuss its repurchasing strategy. At that time, the FTC expressed reservations about the resultant level of concentration in the San Antonio market, and the loss of a competitive balance in the Permian Basin, if Valero reacquired the Trans-Texas Pipeline. On April 11, 1988, twelve days after Enron submitted Valero's second contract to the FTC for approval, Valero dispatched a letter to the FTC addressing these misgivings and urging the FTC to approve Valero.[6] Valero also informed the FTC that Valero's prior contractual right of first refusal would trump the FTC's approval requirement, particularly since the FTC "validated" this right when it took no action on the original NorVal documents. According to Valero, the Hart–Scott–Rodino Act, 15 U.S.C. § 18a, provided the only authority under which the FTC could review this repurchase.[7]

Unpersuaded by Valero's contentions, the FTC sent Enron a letter disapproving Enron's divestiture to Valero.[8] According to the FTC, the divestiture would "not achieve an adequate lessening of concentration among pipeline companies moving gas out of the Permian Basin." Additionally, the sale "would increase the already high concentration levels among pipeline companies able to economically supply natural gas to the San Antonio area."[9] At

---

**4.** Letter from Jack Spinks to Pat Pelder of Reliance Gas Marketing Company (April 5, 1988); Letter from Jack Spinks to Bob Pasteris of West Texas Pipeline Gas Co. (February 16, 1988).

**5.** "Valero Energy Corporation Form 10–K Annual Report", Securities and Exchange Commission File No.1–4718 at 9 (Fiscal Year Ending Dec. 31, 1987); Affidavit of Palmer L. Moe, President and Chief Operating Officer of Valero, in conjunction with Hart–Scott–Rodino filing (April 12, 1988).

**6.** Letter from Stan McLelland, Senior Vice President for Valero, to Daniel P. Ducore, Deputy Assistant Director of FTC (April 11, 1988).

**7.** In reality, Valero did not need to make a Hart–Scott–Rodino filing since FTC exempted assets transferred pursuant to an FTC consent order from the pre-merger notification requirements. 16 C.F.R. § 802.70.

**8.** Letter from Emily H. Rock, Secretary of FTC to Bertram M. Kantor, Legal Counsel for Enron and attorney with Wachtell, Lipton, Rosen & Katz (May 23, 1988) (Regarding potential divestees of the pipeline).

**9.** See also Memorandum from John Morris and David Reiffen, Economists to FTC (March 11, 1988) (Concerning TransTexas Divesture) ("The level of, and increase in, concentration in the San Antonio market area . . . suggest[s] that Valero would be more likely to exercise market power in the San Antonio area if it were to acquire Enron's share of TransTexas.")

the same time, the FTC ratified the proposed divestiture to TECO because, as a new entrant into the market, TECO "[would] help achieve the remedial goals of the Commission's [consent decree]." [10]

Valero took two actions in response to the FTC's letter. Before the Commission, Valero requested that the FTC rescind its disapproval of the divestiture to Valero, or in the alternative that the FTC reopen the proceedings which resulted in the consent order. To support this request, Valero contended that the Commission's disapproval of Valero:

> abrogate[d] Valero's preexisting right of first refusal to reacquire its interest in the TransTexas pipeline without any evidence that [Valero's exercise of that right] would violate the antitrust laws, without a hearing as to whether the exercise of Valero's contractual rights would violate the antitrust laws, and without a finding by the Commission that Valero's exercise of its preexisting contractual right would violate the antitrust laws. [11]

Valero also divulged that it planned to acquire and resell Enron's pipeline interest to a more suitable partner than TECO. In connection with its rescission request, Valero met with the FTC·on five different occasions, and submitted a memorandum to the FTC detailing Valero's concerns. [12]

In a letter dated August 18, 1988, the FTC explained in detail why it was denying Valero's request for reconsideration. [13] First, Valero had notice of the consent decree and many opportunities to present its objections to the FTC before the FTC finalized its order. By electing not to participate in the notice and comment process, Valero waived its objections. Second, Valero failed to present its objections in a timely fashion to the FTC during the approval process for either·the first or the second purchase contract, again waiving those arguments.

Third, the FTC's actions did not impinge upon Valero's right of first refusal. Valero exercised that right twice, signing two different purchase agreements which expressly conditioned Valero's reacquisition of the pipeline on FTC approval. Fourth, sale of the pipeline to Valero would not achieve the remedial purposes of the consent decree to eliminate the lessening of competition in the Permian basin area. Finally, Valero had disclosed its immediate intention to resell the pipeline. Since the

---

**10.** Valero surmises that the FTC erred not only by exercising approval power over the sale, but also by disallowing Enron's sale to Valero as a result of the FTC's decision to approve the purchase by TECO. 9 Trial Transcript at 248. The record does not support this argument.

As Valero contends, the FTC could have approved the sale to both purchasers, permitting Enron to choose the ultimate owner. However, documents from the FTC make it quite clear that the FTC found Valero's repurchase of the pipeline to be unacceptable. *See* Memorandum from John Morris and David Reiffen, Economists to FTC (March 11, 1988) ("Valero is not an acceptable purchaser.") According to FTC economists, "the most reasonable solution seems to be for the Commission to reject the sale to Valero, approve an acceptable purchaser (TECO), and take any appropriate steps to prevent Valero from exercising its right of first refusal if Valero blocks a procompetitive divestiture." *Id.* By approving TECO and disapproving Valero in the same letter, the FTC sought to emphasize Valero's unacceptability as a repurchaser, rather than to pick and choose among several acceptable potential acquirers. *See* Memorandum from Joseph Eckhaus and Roy Conn III, Attorneys for FTC, to Commission, 4 Administrative Record Relating to TransTexas

Divestiture, FTC docket No. C–3168, at 2114 (July 22, 1988); Memorandum from Mark Horoschak, Attorney Advisor to the FTC, to the Public Record, FTC Docket ·Number C–3168 (May 9, 1988) (Minutes of Meeting with Enron's Counsel); Memorandum from Barbara A. Clark, Deputy Director of FTC, to the Commission, 4 Administrative Record Relating to Trans-Texas Divestiture, FTC docket No. C–3168, at 1817 n. 4 (March 15, 1988).

**11.** *See* Memorandum from Joseph Eckhaus and Roy Conn III, Attorneys for FTC, to Commission, 4 Administrative Record Relating to Trans-Texas Divestiture, FTC docket No. C–3168, at 2121 (July 22, 1988).

**12.** Memorandum from Valero to FTC, 1 Administrative Record Relating to TransTexas Divestiture, FTC docket No. C–3168 at 1642–1734 (August 2, 1988).

**13.** Letter from Benjamin I Berman, Acting Secretary of FTC, to David M. Foster, Legal Counsel for Valero and attorney with Fulbright & Jaworski, 1 Administrative Record Relating to Trans-Texas Divestiture, FTC docket No. C–3168 at 1744–1754 (August 18,. 1988).

FTC could not monitor this resale, Valero's reacquisition of the pipeline could undermine the consent decree's purposes to increase competition, and to ensure the continuation of the assets as ongoing, viable enterprises. For these reasons, the FTC denied Valero's request for reconsideration.

Besides pursuing its interests before the FTC, Valero also raised its objections to FTC disapproval in state court. On May 27, 1988, Valero filed a contract action in Bexar County, Texas, claiming that Enron's sale of its TransTexas pipeline interest to TECO violated Valero's first refusal rights, as exercised in the second Enron/Valero repurchase agreement. Valero received a temporary restraining order and subsequently secured a temporary injunction (June 9, 1988), both of which prevented Enron from conveying its pipeline interest to TECO pending a final decision on the merits.

Defendants Enron and NorTex removed the case to federal court, where the temporary injunction remained in effect. Valero amended its complaint to add the FTC as a party, alleging that the FTC exceeded its constitutional and statutory authority, and acted arbitrarily and capriciously when it disapproved the pipeline sale to Valero. Enron responded that it had not breached the sales agreement, and that a forced sale to Valero would cause Enron to violate the consent decree.

After a trial on the merits, the district court found that Enron had included the FTC approval condition in the second Enron/Valero repurchase agreement in good faith, that Valero signed the contract containing that prerequisite, and that the FTC disapproved the sale. As a result, Enron was under no obligation to convey the TransTexas Pipeline to Valero. With regard to the FTC, the court held that the FTC acted within its statutory authority when it entered the consent order, that the FTC could condition mandatory pipeline divestiture on FTC approval of the purchas-

er, and that the FTC did not arbitrarily and capriciously withhold its approval from Valero. Based on these findings, the court entered judgment for the defendants, and dissolved the temporary injunction. Valero appeals.

## DISCUSSION

It is uncontroverted that Valero signed a pipeline repurchase agreement which conditioned acquisition of the TransTexas pipeline on FTC approval of Valero as the purchaser. Valero does not contend that it executed the contract under duress, or that Enron's bad faith induced Valero to sign the agreement. Instead, on appeal, Valero pursues its two-pronged attack against the contract's FTC approval term.

Under the contract itself, Valero argues that by insisting on FTC approval as a prerequisite to the agreement, Enron created an untenable dilemma: either Valero could exercise its preemptive rights by signing the sales contract which subjected it to FTC control, or Valero could reject the contract and lose the pipeline. Valero asserts that this dilemma effectively gutted its preemptive rights. With regard to the FTC, Valero contends that the Commission exceeded its statutory authority by manipulating the Enron consent decree to extinguish the pre-existing contract rights of a non-party and by disapproving Valero as a purchaser without first determining that the acquisition violated federal antitrust laws. We reject both prongs of this attack.

 Valero's argument that Enron and the FTC abrogated its pre-existing right of first refusal misunderstands the nature of the preemptive rights guaranteed to Valero by the Ownership Agreement.[14] A "right of first refusal", also known as a "preemptive right" or a "preferential right of purchase," permits the rightholder to purchase the subject property, once the owner chooses to sell, on the terms and conditions specified in the contract granting the right. *Holland v. Fleming,* 728

---

**14.** The Ownership Agreement provides that Texas law governs conflicts over contract interpre- tation.

S.W.2d 820, 822 (Tex.Civ.App.1987, writ ref'd n.r.e.); *Palmer v. Liles,* 677 S.W.2d 661, 665 (Tex.Civ.App.1984, writ ref'd n.r.e.); *Sanchez v. Dickinson,* 551 S.W.2d 481, 484 (Tex.Civ.App.1977, no writ); *Martin v. Lott,* 482 S.W.2d 917, 920 (Tex.Civ.App. 1972, no writ); *Gochman v. Draper,* 389 S.W.2d 571 (Tex.Civ.App.1965, writ granted), reversed on other grounds, 400 S.W.2d 545 (Tex.1966). The holder of the first refusal right cannot compel a recalcitrant owner to convey the property. *Sanchez,* 551 S.W.2d at 484, 485; 77 Am.Jur.2d Vendor & Purchaser § 49 (1975). Rather, the contract guarantees that the rightholder will receive notice when the owner intends to sell the property, information about the terms and conditions of that sale, and a reasonable period within which to accept or reject the offer. *Martin,* 482 S.W.2d at 920, 922. *See* 1A Corbin on Contracts § 261 (1963).

The details of a particular preemptive right depend upon the contract between the parties. The terms of those contracts vary widely, and courts must scrutinize the parties' language to ascertain the scope of the preemptive right.[15] 1A Corbin on Contracts § 261 (1963). Although some contracts specify the price at which the owner must sell the property, most contracts base the sale price and other terms of the rightholder's purchase contract on the bona fide offer made by a third party. *Sanchez,* 551 S.W.2d at 485–86; *Sinclair Refining Co. v. Allbritton,* 147 Tex. 468, 218 S.W.2d 185, 188 (1949). *See Brownies Creek Collieries, Inc. v. Asher Coal Mining Co.,* 417 S.W.2d 249, 252 (Ky.Ct.App.1967). 1A Corbin on Contracts § 261 (1963); 77 Am. Jur.2d Vendor & Purchaser § 49 (1975).

Article IX of the 1985 Ownership Agreement between Valero and Enron spells out the parties' rights of first refusal. Section 9.1 states:

> 9.1 *Right of First Refusal.* In the event either Party desires to sell or transfer all or part of its undivided interest in the System to an entity other than an affiliated entity of that Party and receives or solicits a bona fide offer or agreement from a prospective purchaser (who must be ready, willing, and able to purchase) that such Party is willing to accept, then the Party desiring to sell or transfer such interest shall first give written notice of the proposed sale to the other Party, such notice to set forth the *terms and conditions* of such proposed sale and the name and address of the prospective purchaser. The other party shall then have a prior right, for a period of sixty (60) days after receipt of such notice, to agree to purchase such interest *on the same terms and conditions* as set forth in such offer or agreement to purchase. . . .

Under this provision, when Enron receives an acceptable bona fide offer from a prospective pipeline purchaser, Enron must forward the terms and conditions of that offer to Valero. If, within sixty days, Valero elects to meet those terms and conditions, this provision obligates Enron to sell Valero the half-interest.

Valero contends that by executing this provision, Enron pre-approved Valero as the purchaser of the pipeline, as long as Valero matched the price term offered by the third party. Enron breached this preemptive right, the argument continues, by interjecting an intermediate condition, FTC approval, into the purchase agreement. We reject this contention.

The Ownership Agreement between Enron and Valero explicitly allows Valero to reacquire the pipeline "on the same terms

---

**15.** The moment at which the owner must offer the property for sale to the rightholder will also vary from contract to contract. Some contracts require the owner to offer the property for sale to the rightholder before soliciting offers from any independent party. Other contracts oblige the owner to communicate any third-party offer to the rightholder and permit the rightholder to match that offer. If the owner elects to accept the proffered terms, the owner must sell the property to the rightholder. *Mecom v. Gallagher,* 213 S.W.2d 304, 305 (Tex.Civ.App.1947, no writ). Finally, some owners need only forward to the rightholder the terms and conditions of those offers which they are willing to accept. If the rightholder duplicates those terms, he acquires the property. *See Holland v. Fleming,* 728 S.W.2d 820 (Tex.Civ.App.1987); 1A Corbin on Contracts § 261 (1963).

and conditions as set forth in [a third party] offer or agreement to purchase." Under this language, the terms and conditions governing Valero's repurchase remain indeterminate until Enron receives an acceptable offer from a third party. *Joe T. Garcia's Enterprises v. Snadon*, 751 S.W.2d 914, 916 (Tex.Civ.App.1988, writ denied). *See Gyurkey v. Babler*, 103 Idaho 663, 651 P.2d 928, 931 (1982). Nowhere does the Ownership Agreement require Enron to include specific conditions in this offer, or limit the terms for which Enron may bargain with the potential purchaser. Once Enron communicates its third-party offer to Valero, however, Enron binds itself to accept these conditions and cannot place additional prerequisites on Valero's exercise of its preemptive rights. *Sinclair Refining Co.*, 218 S.W.2d at 188; *Holland*, 728 S.W.2d at 822–23; *Henderson v. Nitschke*, 470 S.W.2d 410 (Tex.Civ.App. 1970, writ ref'd n.r.e.). *See* 77 Am.Jur.2d Vendor & Purchaser § 49 (1975). Until that time, however, the Ownership Agreement does not restrict Enron's ability to strike its best deal and to require Valero to match that bargain.

■ Traditional contract principles do marginally circumscribe this bargaining freedom, but the FTC approval provision remains well within these limitations. Under language comparable to that used in the Enron/Valero Ownership Agreement, the owner of property subject to a right of first refusal remains master of the conditions under which he will relinquish his interest, as long as those conditions are commercially reasonable, imposed in good faith, and not specifically designed to defeat the preemptive rights. *Holland*, 728 S.W.2d at 823. *See McCulloch v. M & C Beauty Colleges*, 194 Cal.App.3d 1338, 240 Cal.Rptr. 189 (1987); *Brownies Creek Collieries, Inc.*, 417 S.W.2d at 252; *Hood v. Hawkins*, 478 A.2d 181 (R.I.1984); *Weber Meadow–View Corp. v. Wilde*, 575 P.2d 1053, 1055 (Utah 1978); *Matson v. Emory*, 36 Wash.App. 681, 676 P.2d 1029, 1032–33 (1984). *See* 1A Corbin on Contracts § 261 (1963). Where the owner meets these three standards, the holder of the right of first refusal lacks grounds to remove specific conditions from the contract, or to extract other concessions as part of the agreement.

■ In the present case, TECO agreed to subject its pipeline purchase to FTC approval. The Ownership Agreement makes this term part of any purchase contract between Enron and Valero, as long as the approval requirement is commercially reasonable, imposed in good faith, and not specifically designed to defeat Valero's preemptive rights. The district court found that Enron and TECO included the approval term in good faith, without subterfuge or collusion, and without an ulterior motive to override Valero's right of first refusal. Valero does not object to these conclusions.

The approval requirement is also commercially reasonable. Whether a specific condition is reasonable must be determined by examining the circumstances of a particular case. *Prince v. Elm Investment Co., Inc.*, 649 P.2d 820, 825 (Utah 1982). In this instance, Enron and TECO agreed to include the approval term only after extensive arms-length negotiations which resulted in a comprehensive pipeline purchase agreement. Enron did not dictate the approval term to TECO, or coerce TECO into accepting that term. On the contrary, TECO undoubtedly gained concessions from Enron in other contract areas to offset the risk that the FTC might withhold its consent. Where two sophisticated businesses reach a hard-fought agreement through lengthy negotiations, it is difficult to conclude that any negotiated term placed in their contract is commercially unreasonable.

Furthermore, business venturers routinely subject their contracts to outside approval for financing or credit-worthiness in order to guarantee the financial success of venture. *McCulloch*, 194 Cal.App.3d at 1338, 240 Cal.Rptr. at 189; *Keys Lobster v. Ocean Divers*, 468 So.2d 360, 362 (Fla. App.), rev. denied 480 So.2d 1295 (1985). For Enron, the FTC approval requirement serves a similar function. Without that term, Enron risked fines of $10,000 per day

under the consent decree if the FTC disapproved of the pipeline acquirer. In order to prevent these losses, Enron requested FTC approval as a precondition to the purchase agreement. For these reasons, we find that Enron did not violate Valero's right of first refusal by incorporating the FTC approval term into the TECO purchase agreement.

Even if Enron legitimately included the FTC approval term in the purchase agreement, Valero contends that it could exercise its right of first refusal without matching this term. According to Valero, its preemptive rights require it to match only the *price* term of any third party offer. Further, assenting to the agreement while rejecting FTC approval should suffice as acceptance under standard contract principles, since Valero's qualified acceptance would not substantially modify the terms of TECO's third-party offer. Finally, Enron's bad faith in committing antitrust violations, and in submitting TECO's contract to the FTC, should excuse Valero's strict compliance with the contract terms. Once again, we find that both the Ownership Agreement and well-settled contract principles defeat these arguments.

In order for Valero to exercise its preemptive rights, the Ownership Agreement compels Valero to match the "terms and conditions" offered by a third party. The agreement does not define the phrase "terms and conditions" to mean only the price suggested by a prospective purchaser. When construing similar language in other contracts, most courts have insisted that purchasers replicate a myriad of non-price conditions, including terms requiring adequate credit and special payment terms, *McCulloch*, 194 Cal.App.3d at 1338, 240 Cal.Rptr. at 189; *Keys Lobster*, 468 So.2d at 362; the assumption of real estate commissions, *Fallenius v. Walker*, 787 P.2d 203, 205 (Colo.App.1989), *cert. denied* (1990); additional partnership and land development obligations, *Prince*, 649 P.2d at 823–26; the exchange of land parcels rather than a cash transaction, *Matson*, 676 P.2d at 1033; and the purchase of a larger quantity of land, *Crow–Spieker No. 23 v.*

*Robert L. Helms Construction and Development Co.*, 103 Nev. 1, 731 P.2d 348, 350 (1987). *But see Gyurkey*, 651 P.2d at 932, and cases cited therein. Valero presents no rationale justifying a contrary interpretation of the identical language in this case.

As Valero correctly points out, some courts have allowed purchasers to exercise their preemptive rights by duplicating solely the price term offered by the third-party. In most of these cases, however, the contract which created the preemptive right specified that price would be the only relevant term. *Kroehnke v. Zimmerman*, 171 Colo. 365, 467 P.2d 265 (1970) ("[I]f during the term of this lease ... the lessors ... should desire to sell said demised premises, then the lessees ... shall have the privilege of purchasing the same for the same *price* for which the lessors would be willing to sell to any other person."); *Schmidt v. Downs*, 775 P.2d 427, 430 (Utah App.1989); *Wilson v. Whinery*, 37 Wash.App. 24, 678 P.2d 354 rev. denied (1984). By contrast, Valero's Ownership Agreement requires Valero to meet the "terms and conditions" contained in a third party offer. Had Enron and Valero intended to restrict the phrase "terms and conditions" to mean only price, the parties could have executed an agreement similar to those construed in these other cases.

One case which Valero cites does contain language replicating Valero's right of first refusal. *Hallmark Builders Inc. v. Hickory Lakes of Brandon, Inc.*, 444 So.2d 1047 (Fla.App.1984). However, in that case, the third party offer which *Hallmark* was required to duplicate contained only one relevant term—the price of the property. Under the "terms and conditions" language, Hallmark needed to reproduce only the price term. On the other hand, the comprehensive purchase contract between Enron and TECO contains many relevant terms, one of which specifies the purchase price. Valero's preemptive right requires Valero to meet all relevant terms and conditions.

Valero next contends that while it must meet the "terms and conditions" contained in TECO's contract, Valero may ignore any non-material provisions when tendering its

acceptance. According to Valero, FTC approval is not a material term. By requiring Valero to match that term or to forego this transaction, Enron created a false dilemma. Valero signed the purchase contract containing that term to avoid losing the pipeline; however, Enron and Valero never reached a consensus over FTC approval. Accordingly, the court should find both that Valero could exercise its option without agreeing to FTC approval, and that the contract between the parties did not actually include that term. Valero's argument contradicts the facts of this case and contravenes well-settled contract principles since any attempt by Valero to accept the TECO contract without the FTC approval term would substantially vary the terms of the sales agreement.

■ When the preemptive rightholder receives notice that the property owner intends to sell his property to a third party, the rightholder's right of first refusal matures into an *option,* for which the third party offer dictates the terms. *Sinclair Refining Co.,* 218 S.W.2d at 188; *Holland,* 728 S.W.2d at 822–23; *Henderson,* 470 S.W.2d at 410. *See* 77 Am.Jur.2d Vendor & Purchaser § 49 (1975). Before the option can ripen into an enforceable contract of sale, the rightholder must manifest his acceptance. *Walker v. Horine,* 695 S.W.2d 572, 576 (Tex.Ct.App.1985, no writ); *White v. Miller,* 518 S.W.2d 383 (Tex.Civ.App. 1974, writ dism'd); *Hutcherson v. Cronin,* 426 S.W.2d 638 (Tex.Civ.App.1968, no writ).

Valero argues that adoption of the TECO contract without including the FTC approval term would have constituted a valid acceptance, since FTC approval was not a material term. Whether or not a particular contract term is material is not the standard by which we judge whether an acceptance which rejects that term is a valid exercise of the right of first refusal. Like the acceptance of any other offer, the exercise of an option, must be "unqualified, absolute, unconditional, unequivocal, unambiguous, positive, without reservation and according to the terms or conditions of the option." *Scott v. Vandor,* 671 S.W.2d 79, 84 (Tex.Civ.App.1984, writ ref'd n.r.e.);

*White,* 518 S.W.2d at 383; *Hutcherson,* 426 S.W.2d at 638; *Vratis v. Baxter,* 315 S.W.2d 331, 337 (Tex.Civ.App.1958, writ ref'd n.r.e.). *See Austin Presbyterian Theological Seminary v. Moorman,* 391 S.W.2d 717 (Tex.), *cert. denied* 382 U.S. 957, 86 S.Ct. 434, 15 L.Ed.2d 361 (1965). An unqualified acceptance guarantees that the owner of the property will receive the benefit of the bargain under which he agreed to relinquish his interests. *Holland,* 728 S.W.2d at 823. *See McCulloch,* 194 Cal.App.3d at 1338, 240 Cal.Rptr. at 189; *Brownies Creek Collieries, Inc.,* 417 S.W.2d at 252; *Hood,* 478 A.2d at 181; *Weber Meadow–View Corp.,* 575 P.2d at 1055; *Matson,* 676 P.2d at 1032–33. *See* 1A Corbin on Contracts § 261 (1963).

■ Where an acceptance varies from the original offer, the property owner stands to lose his bargain. *Zeidman v. Davis,* 161 Tex. 496, 342 S.W.2d 555 (1961); *White,* 518 S.W.2d at 383; *Hutcherson,* 426 S.W.2d at 638; *Vratis,* 315 S.W.2d at 337; *Lambert v. Taylor Telephone Cooperative,* 276 S.W.2d 929, 932 (Tex.Civ.App. 1955, no writ) (determining whether particular variations in acceptance are substantial). As a result, a purported acceptance which leaves the property owner "as well off" as a third party offer, but which modifies, adds to or otherwise qualifies the terms of the offer, generally constitutes a rejection of the option and a counter-offer. *Austin Presbyterian Theological Seminary,* 391 S.W.2d at 717; *Hutcherson,* 426 S.W.2d at 638; *Lambert,* 276 S.W.2d at 932. *See Brownies Creek Collieries, Inc.,* 417 S.W.2d at 252; *Northwest Television Club v. Gross Seattle Inc.,* 96 Wash.2d 973, 634 P.2d 837, 840 (1981), opinion modified by 96 Wash.2d 973, 640 P.2d 710 (1982); *Matson,* 676 P.2d at 1032. The property owner remains free to accept this counter-offer or to sell the property to the third party, but the preemptive right lapses because the rightholder has failed to make a valid acceptance.

Some courts have recognized a limited exception to these principles of strict conformity for those acceptances which contain minor or insubstantial variations from

the original offer. *Brownies Creek Collieries, Inc.*, 417 S.W.2d at 252 ("[M]inor variations which obviously constitute no substantial departure should be allowed."). *See Prince*, 649 P.2d at 825; *Matson*, 676 P.2d at 1032. No hard and fast rules determine when a variation is "insubstantial," however, courts invoke this exception only when two conditions exist. *Northwest Television Club*, 634 P.2d at 841.

First, the third-party offer may contain terms which are peculiar to the relationship between the third-party and the property owner, and which the preemptive rightholder could never satisfy. For instance, in *Northwest Television Club v. Gross Seattle Inc.*, 96 Wash.2d 973, 634 P.2d 837, 841 (1981), the third party agreed to purchase rental property if he was able to sell his own Mercer Island residence. The seller offered these same terms and conditions, including sale of the Mercer Island property, to the rightholder. The rightholder obviously could not meet this last condition since he did not own that property. Nevertheless, the court rejected the owner's contention that the rightholder failed to exercise his preemptive rights, since the condition embodied nothing more than the third party's attempt to arrange financing. *Id.* 634 P.2d at 841. As long as the rightholder could demonstrate adequate financial resources, the court would prevent the owner from imposing impossible terms to override the rightholder's interest.

Second, the unique conditions do not provide a reasonable basis for distinguishing between the two offers, raising the inference that the seller imposed those terms in bad faith to defeat the option. *Zeidman*, 342 S.W.2d at 555; *Jones v. Gibbs*, 133 Tex. 627, 130 S.W.2d 265, 272 (1939); *Cattle Feeders Inc. v. Jordan*, 549 S.W.2d 29, 33 (Tex.Civ.App.1977, no writ); *Tiffany Development Corporation v. Cangelosi*, 514 S.W.2d 321 (Tex.Civ.App.1974, no writ); *Best Building Company v. Sikes*, 394 S.W.2d 57, 63–4 (Tex.Civ.App.1965, writ ref'd n.r.e.) (owners' wrongful refusal to convey other property defeated option over tract at issue); *Colligan v. Smith*, 366 S.W.2d 816 (Tex.Civ.App.1963, writ ref'd n.r.e.). Whether the justification for a unique term is reasonable depends upon the circumstances of the particular case. *Prince*, 649 P.2d at 825.

For example, in *Prince*, the seller formed a partnership with the third party to acquire, improve and lease the seller's property. The preemptive rightholder offered to meet these partnership terms, but the seller refused because "the bundle of consideration that [seller] received from [the third party] is unique and cannot be duplicated as a matter of law." 649 P.2d at 823. This consideration included the third party's "reputation, expertise and experience in developing office buildings, success in development of real estate, integrity, business history, business contacts, financial strength, effective organization and personal compatibility with [seller]." *Id.* at 823–24. Although the court agreed that unique features underlying the contract could defeat the right of first refusal, the court required the seller to justify those features according to ascertainable commercial standards. *Id.* at 825. If the seller cannot offer an adequate justification, the preemptive rightholder is permitted to meet the conditions of the offer without satisfying these unique terms.

Where these two circumstances do not exist, the courts have required the rightholder to meet all of the terms and conditions of the third party offer, even if this requirement effectively defeats the right of first refusal. The case of *Keys Lobster v. Ocean Divers*, 468 So.2d 360, 362 (Fla.App. 1985) is particularly instructive. There, the seller conditioned sale of his property on proof by the third party that it was sufficiently creditworthy. Seller offered these same terms to the preemptive rightholder, who was unable to demonstrate his creditworthiness. The court permitted the seller to convey the property to the third party because the seller imposed the credit inspection term in good faith to protect his own business interests, and because it was not impossible for the preemptive rightholder to meet that term. *Id.* at 362.

The two conditions for application of the exception to strict compliance do not exist in Valero's case. The FTC approval term

was not a unique condition which arose out of the particular relationship between Enron and TECO. Instead, the consent decree between Enron and the FTC motivated Enron to place that term into *every* contract for purchase of the pipeline. Indeed, Enron testified that it would not sign any agreement which omitted this term. Additionally, the district court specifically found that Enron included that term in the TECO contract in good faith in order to avoid violating the consent decree. Enron did not strive to defeat Valero's right of first refusal. Furthermore, the commercial realities of Enron's situation made FTC approval a reasonable way to distinguish between Valero's and TECO's offers. If the pipeline purchaser did not meet the FTC's guidelines, Enron would subject itself to fines of up to $10,000 per day. Avoiding these fines is clearly commercially reasonable.

Since the exception does not apply, Valero was required to meet all of the terms and conditions of the TECO contract, including the FTC approval term. Failure to include this term in the acceptance would make Valero's exercise of its preemptive rights ineffectual. However, Valero did acquiesce in that term when it signed an interlineated version of the TECO agreement.

■ Valero contends that although it signed this agreement, it did not intend to submit its purchase to the FTC for approval. As evidence for this proposition, Valero tendered a letter which it had submitted to Enron at the time that Valero and Enron executed the TECO purchase contract. *See* Letter from Jack Spinks, Vice President for Valero NorTex L.P. to Enron Corp. (March 29, 1988), Section I, p. 1559 *supra.* However, Enron never signed this letter, or otherwise consented to include the document as part of the agreement between the parties. *See Deauville v. Federated Department Stores,* 756 F.2d 1183, 1193 (5th Cir.1985); *Richland Plantation Co. v. Justiss–Mears Oil,* 671 F.2d 154, 156 (5th Cir.1982). Since the FTC approval provisions are unambiguous, this court may not employ this letter to vary the terms of the parties' signed agreement. *Cherokee Water Co. v. Forderhause,* 641 S.W.2d 522, 524–25 (Tex.1982); *Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515 (Tex. 1968); *Palmer,* 677 S.W.2d at 665. Consequently, regardless of the contrary intent which Valero claims to have displayed, Valero is bound by the FTC approval term in its purchase contract.[16]

With regard to Valero's contract claims, then, we conclude that Enron did not violate Valero's right of first refusal. Enron included the FTC approval term in the TECO contract in good faith. Valero's right of first refusal required it to accept this term in order to exercise its preemptive right. Valero did indeed accept this term when it executed the TECO contract. When Valero failed to meet this condition, Enron was no longer obliged to reconvey the pipeline to Valero. *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976).

In addition to its contract claims against Enron, Valero challenges the FTC's authority to impose an approval condition on nonparties to the consent decree. Enron had pre-approved Valero as a pipeline purchaser. When the FTC entered into the consent decree, it manipulated Valero's pre-existing contract rights by requiring Enron to receive its approval before selling the pipeline to Valero. Then, the FTC exceeded its statutory authority by disapproving Valero without first determining that Valero's acquisition violated federal antitrust laws. Accordingly, Valero urges us to nullify the

16. In the alternative, we could have interpreted the letter presented by Valero at the time that Valero executed the TECO purchase agreement as a rejection of TECO's offer and a counter-offer, because Valero sought to vary one of the material provisions of the purchase agreement. *See Austin Presbyterian Theological Seminary,* 391 S.W.2d at 717; *Hutcherson,* 426 S.W.2d at 638; *Lambert,* 276 S.W.2d at 932. Under this scenario, Valero would have failed to exercise its right of first refusal in accordance with the contract, and Enron could have conveyed the pipeline to TECO. Since Enron did not advance this argument, we do not base our decision on this point.

FTC's authority over Valero's purchase. We decline to follow this suggestion.

There is no doubt that the FTC had the authority to invalidate Enron's merger with Houston Natural Gas unless the partners divested certain of their interests. 15 U.S.C. §§ 21, 45. *See United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 331, 81 S.Ct. 1243, 1252, 6 L.Ed.2d 318 (1961); *Lieberman v. F.T.C.*, 771 F.2d 32, 34 (2nd Cir.1985); *Yamaha Motor Co. v. F.T.C.*, 657 F.2d 971 (8th Cir.1981, *cert. denied* sub. nom. *Brunswick Corp. v. FTC*, 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 174 (1982)); *United States v. Beatrice Foods Co.*, 493 F.2d 1259, 1273 (8th Cir.1974) *cert. denied* 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975); *F.T.C. v. PepsiCo. Inc.*, 477 F.2d 24, 29 (2nd Cir.1973). Furthermore, the FTC may police the asset divestiture, including approval of the purchaser, to ensure that it satisfies the purposes of the consent decree. *See North American Telecommunications Ass'n v. FCC*, 772 F.2d 1282, 1293 (7th Cir.1985); *Beatrice Foods Co.*, 493 F.2d at 1273. Valero argues that its case is different, however, because Enron pre-approved Valero as a purchaser of the pipeline, and FTC approval interfered with these contract rights.

■ Once again, Valero misunderstands the nature of its preemptive right. As explained above, the conditions under which Valero may exercise its right of first refusal materialize after Enron receives a valid offer from an independent third party. Valero may not dictate the terms and conditions of its purchase agreement. Although Valero's right of first refusal arose before the consent decree, the third-party contract containing the approval term was finalized *after* Enron entered into the consent decree. Valero's right of first refusal required it to match the terms in this subsequent contract, including that of FTC approval. As a result, the FTC did not manipulate the consent decree impermissibly to reach a third party. Rather, the interaction between the consent decree and Valero's right of first refusal subjected Valero to FTC authority.[17]

A different situation would exist if Valero had received an option to purchase the pipeline under terms and conditions specified in the original Ownership Agreement. Under this scenario, the FTC approval term would have modified the terms of a contract that was already binding upon Enron. Even in that situation, however, Valero could not compel specific performance of its option contract, since performance of that option would prevent enforcement of an FTC order.[18] *See National Licorice Co. v. NLRB*, 309 U.S. 350, 363, 60 S.Ct. 569, 577, 84 L.Ed. 799 (1940); *Conner v. Burford*, 848 F.2d 1441, 1458–59 (9th Cir. 1988); *PepsiCo. Inc. v. F.T.C.*, 472 F.2d 179, 188 (2nd Cir.1972). Valero's case never reaches this level, however, because Valero held a right of first refusal rather than an option to purchase.

This distinction between rights of first refusal and option contracts explains why *Martin v. Wilks*, —— U.S. ——, 109 S.Ct. 2180, 2185, 104 L.Ed.2d 835 (1989) is inapposite here. In *Martin* white firefighters, who were denied promotions under the terms of their contracts because of an affirmative action consent decree, sued Birmingham, Alabama and the Jefferson County Personnel Board for race discrimination. Both the City and the Board defended against the suit on the grounds that

---

**17.** The same result would obtain if Enron had entered into an agreement with its bankers placing certain conditions, such as a cash purchase requirement, upon Enron's divestiture of its interest in the pipeline. Valero's inability to satisfy the cash purchase requirement would not necessarily mean that Enron or the bankers had deliberately undermined Valero's right of first refusal or that this condition was unenforceable as to Valero.

**18.** The Supreme Court's decision in *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) supports this conclusion. While the decision recognizes that a company cannot necessarily avoid its obligations under a prior contract because these obligations violate the terms of a subsequent consent order, the court also found that the company's liability for breach of the agreement might be limited to an award of damages rather than specific performance. 461 U.S. at 767–769 & n. 13, 103 S.Ct. at 2184–2185 & n. 13.

the consent order required them to make race conscious promotions, and that the white firefighters should have intervened in the consent decree proceeding. The Supreme Court rejected the intervention requirement, explaining that "Joinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are subjected to the jurisdiction of the court and bound by the judgment or the decree." *Id.* at 2186. Accordingly, the Court remanded to the district court for a trial of the claim on the merits.

Valero's situation does not resemble the *Martin* plaintiffs' predicament. Unlike the decree in *Martin,* which directly prevented the promotion of white firefighters, the consent decree between the FTC and Enron does not directly bind Valero. Rather, Valero must submit its acceptance to the FTC for approval because its *right of first refusal* requires Valero to meet the terms and conditions of a third party offer. One of those conditions happens to be FTC approval. Enron is bound by the consent decree to include that FTC approval term in any purchase agreement. Valero is bound by the terms of its preemptive right to accept that term. Therefore, it is the Ownership Agreement and not the consent decree which binds Valero.

As a result, Enron could require Valero to live up to its Ownership Agreement by submitting the purchase contract to the FTC for approval. Furthermore, the FTC could approve or disapprove of Valero as the purchaser as long as Valero's acquisition would impede enforcement of the consent decree. *Beatrice Foods Co.,* 493 F.2d at 1274–75. *See F.T.C. v. Colgate–Palmolive Co.,* 380 U.S. 374, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965). The FTC's reasons for disapproval meet this standard. Moreover, Valero has not appealed the district court's findings that the FTC did not act arbitrarily and capriciously when it disapproved Valero. Consequently, we will not address this issue.

Having found both that the FTC approval term did not violate Valero's contractual right of first refusal and that the FTC did

not exceed its statutory authority when disapproving Valero as a pipeline purchaser, the decision of the district court is AFFIRMED.