419 S.E.2d 699

**JOHN D. STUMP & ASSOCIATES, INC., and John D. Stump, Appellees,**

v.

**CUNNINGHAM MEMORIAL PARK, INC., Smith Company, William E. Smith, D. Ray Smith, and William E. Rowe, Defendants Below**

**Smith Company, William E. Smith and D. Ray Smith, Appellants.**

No. 20208.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 28, 1992.

Decided May 29, 1992.

Rehearing Denied July 21, 1992.

Robert A. Goldberg, Robert B. Allen, Thomas P. Larus, King, Betts & Allen, Charleston, for appellees.

Rudolph L. DiTrapano, DiTrapano & Jackson, Charleston, Rebecca A. Baitty, Sarasota, Fla., for appellants.

MILLER, Justice:

This is an appeal from a final order of the Circuit Court of Kanawha County, dated August 30, 1990, which entered judgment in favor of the plaintiffs below, John D. Stump & Associates, Inc., and John D. Stump, individually, in a civil action for breach of contract. The contract in question granted Mr. Stump an "exclusive option" to purchase a cemetery owned by the defendants and the right to commissions on sales of certain cemetery items.

A number of errors are asserted. With respect to the "exclusive option" claim, we believe this case can be resolved by reference to several key legal principles concerning the nature of a contract provision granting a right of first refusal to purchase property. We conclude for reasons

set out in Part II that plaintiff John D. Stump failed to properly exercise his right of first refusal. We address the sales commission controversy in Part III, and, for the reasons stated therein, we reverse the judgment and award a new trial.

## I.

Defendants William E. and D. Ray Smith are brothers and were the sole officers and shareholders of the corporate defendant, Cunningham Memorial Park, Inc., through which they owned and operated a St. Albans cemetery.[1] In November 1983, the Smiths hired Mr. Stump as an independent contractor to solicit sales of cemetery items, such as grave plots and markers, on their behalf. A written agreement (the Agreement) purporting to memorialize the understanding of the parties was executed in November 1984. The Agreement gave Mr. Stump the "exclusive right" to sell "pre-need" cemetery items for use in the cemetery in exchange for a commission on each such sale. In addition, the Agreement gave Mr. Stump an "exclusive option" to purchase the assets of the corporation if the Smiths desired to sell them while the Agreement was in effect.

In November 1983, Mr. Stump began soliciting pre-need sales on behalf of the corporation through advertising, direct mailings, telephone solicitations, and home visits by his sales staff. These efforts increased pre-need sales. In 1984, Mr. Stump formed John D. Stump & Associates, Inc., a corporate entity to which he assigned his contractual rights with regard to such sales. Mr. Stump personally retained the option rights under the Agreement.[2]

In March of 1985, the Smiths offered to sell Mr. Stump all of the cemetery assets for $3.5 million or all of the cemetery's corporate stock for $3.0 million. Both offers were for cash transactions. Mr. Stump rejected the offer, but stated that he would be interested if the property were offered at a lower price.

In the early months of 1986, the Smiths received an offer to purchase the cemetery from William E. Rowe. By letter dated February 25, 1986, the Smiths offered to sell Mr. Stump all of the corporate stock at a price of $1.5 million. By letter dated March 7, 1986, Mr. Stump rejected the offer, but reserved the right to make a counteroffer. Subsequently, in a letter dated March 19, 1986, Mr. Stump's attorney advised the Smiths that Mr. Stump claimed that over $77,000 in commissions were due him under the pre-need sales provisions of the Agreement.

The Smiths notified Mr. Stump through a March 25, 1986 letter that the previous offer to sell the cemetery stock had been withdrawn. They offered to sell him the assets of the cemetery corporation for $1.1 million upon condition that he assume the liabilities of the corporation and pay an additional $400,000 for a ten-year covenant not to compete.[3] This letter was the result of a second offer from Mr. Rowe.

By letter dated April 3, 1986, Mr. Stump responded that he was willing to accept the offer "subject to my being able to secure suitable financing[.]" Mr. Stump also stated, however, that he had "no need of a noncompetitive agreement. Under the language of the [Agreement] there was no contemplation of any payment for a non-

---

1. Cunningham Memorial Park, Inc., was succeeded by Smith Company, one of the appellants herein. These parties will hereinafter be referred to as "the Smiths."

2. Hereafter, we will refer to both the individual and corporate plaintiffs as "Mr. Stump."

3. The relevant language of the March 25, 1986 letter was:

"(1) The purchase price of all of the assets of the Corporation is $1,100,000, subject to increase by one-half of the amount by [which]

the liabilities of the Corporation due within one year exceed $350,000 as of March 21, 1986.

"(2) The purchaser will assume all of the liabilities of the Corporation.

"(3) The purchaser will pay the shareholders of the Corporation the sum of $400,000 for their agreement not to compete with the purchaser, directly or indirectly, as shareholders, owners, directors, employees or officers of any other corporation or firm, in Kanawha and contiguous counties, for a period of ten years. This agreement is an integral part of the offer and proposed transaction."

competitive clause and such clause cannot be considered an asset of the corporation."

The Smiths responded in an April 7, 1986 letter advising Mr. Stump that the Agreement did not provide for conditional acceptance of an offer and repeated that the covenant not to compete was "an integral part of the offer and of the proposed transaction[.]" This letter concluded that as a consequence of Mr. Stump's position, the Smiths did not view his response as an acceptance and that they had sold the corporate assets to Mr. Rowe.

On April 7, 1986, the Smiths and Mr. Rowe executed an asset purchase contract which transferred all the assets of the cemetery corporation, except the pre-need sales contract with Mr. Stump, to Mr. Rowe. The contract specified that payment was to be made by a cash downpayment of $200,000 and the issuance of promissory notes payable over a period of years. Mr. Rowe further agreed to assume all liabilities of the corporation, except those under the pre-need sales contract, and to pay the Smiths $400,000 over a period of ten years, without interest, for the covenant not to compete.

On December 22, 1986, Mr. Stump filed suit in the Circuit Court of Kanawha County against the Smiths and Mr. Rowe. The complaint charged that the Smiths had failed to honor Mr. Stump's exclusive right to sell pre-need items by failing to pay him commissions on sales of such items. It also alleged that the Smiths had interfered with his "exclusive option" to purchase the cemetery by refusing his "acceptance" of the March 25, 1986 offer and by selling to Mr. Rowe on more favorable terms. Finally, the complaint charged Mr. Rowe with tortious interference with Mr. Stump's contract rights and with unjust enrichment.[4] Mr. Rowe subsequently settled with Mr. Stump and was dismissed from the case.

Trial commenced in the circuit court on July 9, 1990. The jury found for Mr. Stump and, by verdict dated July 19, 1990, awarded him $92,750 on his claim for un-

paid sales commissions and $249,244 on his claim resulting from the sale of the cemetery to Mr. Rowe. The jury awarded interest on both verdicts. On August 30, 1990, the circuit court entered judgment against the Smiths in the amount of $505,157.36. It is from this order that the Smiths now appeal. By order dated October 29, 1990, the circuit court denied the Smiths' motions for judgment notwithstanding the verdict, for new trial, and to alter or amend the judgment.

## II.

We first consider the Smiths' claims relating to the "exclusive option" to purchase the assets of the corporation. Paragraph 15 of the Agreement provides: "If Owner [the Smiths], at any time while this contract is in force and effect, shall desire to sell all its corporate assets for a sale price, or a consideration payable entirely in cash, Contractor [Mr. Stump] shall have the exclusive option, which option may not be assigned, for a period of ten (10) days next after receipt of the offer to sell, to accept said offer." This provision gave the Smiths twenty days after acceptance to notify Mr. Stump of a time and place for the closing and provided for delivery of the documents of title at the closing "concurrently with the payment of the purchase price." Paragraph 15 also gave the Smiths the power to terminate Mr. Stump's option rights if he failed to comply with the provisions relating to acceptance of an offer or payment of the purchase price. The Agreement further provided:

"If Contractor shall decline to accept any offer to sell by Owner and Owner shall not sell such assets at the price offered to Contractor, and Owner at any time thereafter while this Agreement is in effect shall desire to sell the same at a different price, Owner shall first offer such property to Contractor, at the new price, who shall have the right to follow the same procedure with respect thereto as he had in respect to the first offer."

4. The complaint also charged the Smiths with tortious interference with contract, but this allegation was later dismissed.

■ As an initial matter, we note that the "option to purchase" granted Mr. Stump under Paragraph 15 is more accurately characterized as a "pre-emptive right" or "right of first refusal." In *Smith v. VanVoorhis*, 170 W.Va. 729, 731, 296 S.E.2d 851, 853 (1982), we noted the difference between these rights: " 'In a typical option the optionee has the absolute right to purchase something for a definite consideration.' " *Quoting Atchison v. City of Englewood*, 170 Colo. 295, 305, 463 P.2d 297, 301 (1970). In Syllabus Point 1 of *Smith*, we described the right of first refusal:

"A pre-emptive right involves the creation of the privilege to purchase only on the formulation of a desire on the part of the owner to sell; and the holder of the right must purchase for the price at which the owner is willing to sell to a third person."

The distinction between an option and a right of first refusal has also been stated in the following manner:

"A preemptive right does not give the preemptioner the power to compel an unwilling owner to sell; it merely requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the preemptive right at the stipulated price[.]" *Mercer v. Lemmens*, 230 Cal.App.2d 167, 170, 40 Cal.Rptr. 803, 805 (1964).

*See, e.g., Anderson v. Armour & Co.*, 205 Kan. 801, 473 P.2d 84 (1970); *Pace v. Culpepper*, 347 So.2d 1313 (Miss.1977); *Beets v. Tyler*, 365 Mo. 895, 290 S.W.2d 76 (1956). *See generally* 77 Am.Jur.2d *Vendor & Purchaser* § 49 (1975 & Supp.1992).

Our cases contain some general discussion regarding the rights of the various parties with regard to a pre-emptive right of first refusal. In our most recent case, *Smith v. VanVoorhis, supra*, we consider only whether the pre-emptive right violated the rule against perpetuities. In *Hartmann v. Windsor Hotel Co.*, 132 W.Va. 307, 52 S.E.2d 48 (1949), which involved a right of first refusal in a lease, we recognized that the owner had to offer to sell the property to the rightholder at the same price offered by the third party. *Hartmann* confirmed our earlier decision in *Casto v. Cook*, 91 W.Va. 209, 112 S.E. 502 (1922), where we recognized that a pre-emptive rightholder could sue when the property owner sold to a third party without giving notice to the rightholder. Finally, in *Peerless Department Stores v. George M. Snook Co.*, 123 W.Va. 77, 15 S.E.2d 169 (1941), we dealt with another lease with a right of first refusal. The landlord claimed that the lessee failed to timely exercise its rights. However, we held that the time to exercise did not begin to run until written notice of an unconditional offer was given. In *Peerless Department Stores*, the third party's offer was conditional because it was dependent on obtaining adequate financing.

■ From these cases, we discern the following general principles with regard to a right of first refusal. The owner of property burdened by a pre-emptive right, also known as a right of first refusal, must, before selling such property to a third party, give written notice to the rightholder of the third party's offer and of the owner's intention to accept such offer. The rightholder is then required to advise the owner that he is willing to purchase the property on the same terms.

An aspect that we have not touched upon is the generally recognized rule that once the owner of property notifies the holder of a pre-emptive right of a third-party offer to purchase the property, the pre-emptive right becomes an option to purchase. *See West Texas Transmission, L.P. v. Enron Corp.*, 907 F.2d 1554 (5th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991) (Texas law); *Mercer v. Lemmens, supra; Smith v. Hevro Realty Corp.*, 199 Conn. 330, 507 A.2d 980 (1986); *Coastal Bay Golf Club, Inc. v. Holbein*, 231 So.2d 854 (Fla.App.1970); *Weintz v. Bumgarner*, 150 Mont. 306, 434 P.2d 712 (1967). *See generally* 1 *Tiffany Real Property* § 310b (1992 Cum.Supp.); 91 C.J.S. *Vendor & Purchaser* § 19.1 (1991 Supp.). The Court of Appeals for the Fifth Circuit in *West Texas Transmission, L.P.*

*v. Enron Corp.*, 907 F.2d at 1565, summarized this rule as follows:

> "When the preemptive rightholder receives notice that the property owner intends to sell his property to a third party, the rightholder's right of first refusal matures into an *option,* for which the third party offer dictates the terms.... Before the option can ripen into an enforceable contract of sale, the rightholder must manifest his acceptance." (Citations omitted).

 We have held that an option becomes a contract to sell only upon acceptance of the seller's offer, as we stated in the Syllabus of *Tate v. Wood,* 169 W.Va. 584, 289 S.E.2d 432 (1982):

> "An option to purchase is not a sale nor agreement to sell: it becomes an executory contract only when properly accepted within the stipulated time."

*See also General Elec. Co. v. Keyser,* 166 W.Va. 456, 275 S.E.2d 289 (1981); *West Virginia Power & Transmission Co. v. Voight,* 91 W.Va. 581, 114 S.E. 138 (1922); *Morgan–Gardner Elec. Co. v. Beelick Knob Coal Co.,* 91 W.Va. 347, 112 S.E. 587 (1922). *See generally* 91 C.J.S. *Vendor & Purchaser* § 19.1. We have also recognized that to be effective, an acceptance of a contractual offer must be unequivocal and unconditional and may not introduce additional terms and conditions not found in the offer. As we stated in Syllabus Point 2 of *Bowers Co. v. Kanawha Valley Products Co.,* 100 W.Va. 278, 130 S.E. 284 (1925):

> "A party to whom an offer of contract is made must either accept it wholly or reject it wholly. A proposition to accept on terms varying from those offered is a rejection of the offer, and a substitution in its place of the counter proposition. It puts an end to the negotiation so far as the original offer is concerned."

*Accord* Syllabus, *Stark Elec., Inc. v. Huntington Housing Auth.,* 180 W.Va. 140, 375 S.E.2d 772 (1988). *See also Hancock v. Fletcher,* 113 W.Va. 624, 169 S.E. 457

(1933). *See generally* 17A Am.Jur.2d *Contracts* § 86 (1991).

These principles are equally applicable to option contracts where the holder of the option desires to exercise an acceptance of its terms. *See Weaver v. Burr,* 31 W.Va. 736, 8 S.E. 743 (1888). *See generally* 17A Am.Jur.2d *Contracts* § 73; 77 Am.Jur.2d *Vendor & Purchaser* §§ 40, 41. Thus, where the acceptance of a pre-emptive rightholder varies materially from the terms of the third party's offer, it is viewed as a rejection of the seller's offer and terminates the option right. *See, e.g., Chevy Chase Servs., Inc. v. Marceron,* 314 F.2d 275 (D.C.Cir.1963); *Lehr v. Breakstone,* 472 So.2d 1333 (Fla.App.1985); *Yorkridge Serv. Corp. v. Boring,* 38 Md.App. 624, 382 A.2d 343 (1978); *Gibraltar Realty Investors, Ltd. v. Shulen Realty Corp.,* 156 A.D.2d 260, 549 N.Y.S.2d 2 (1989).

 From the foregoing, we conclude that a right of first refusal becomes an option once the holder of such right is notified by the property owner of the terms of a third-party offer to purchase the property. In order to properly exercise the resulting option, the rightholder's acceptance must be unequivocal and must not vary from the proffered terms.

 The evidence at trial with regard to Mr. Stump's response consisted of his April 3, 1986 letter to the Smiths. In that letter, Mr. Stump rejected any purchase of a covenant not to compete and conditioned his acceptance of the rest of the offer on his ability to obtain financing. This was not a clear and unequivocal acceptance of the Smiths' offer to sell, and, therefore, as a matter of law, the Smiths could reject his response, as they did in their April 7, 1986 letter.

Mr. Stump's primary defense is that the notice given to him of a third-party purchase offer did not fully disclose all of the terms of Mr. Rowe's offer to purchase the corporate assets.[5] Courts have not discussed in detail the requisites of the notice

---

5. Under Mr. Rowe's offer to the Smiths, the $1.1 million sale price was structured by $200,000 cash downpayment and promissory notes. The $400,000 for the covenant not to compete was payable over ten years without interest.

that must be given to the holder of a right of first refusal. Most courts, without any elaborate discussion, require only that reasonable notice be given. *E.g., Meyer v. Warner*, 104 Ariz. 44, 448 P.2d 394 (1968); *Eliminator, Inc. v. 4700 Holly Corp.*, 681 P.2d 536 (Colo.App.1984); *Shell Oil Co. v. Jolley*, 130 Vt. 482, 296 A.2d 236 (1972); *Matson v. Emory*, 36 Wash.App. 681, 676 P.2d 1029 (1984). The most detailed discussion we have found is in *Koch Industries, Inc. v. Sun Co.*, 918 F.2d 1203, 1212 (5th Cir.1990), where the court, applying Texas law, summarized the responsibilities of both the property owner and the rightholder:

> "[T]he owner has an initial duty to make a 'reasonable' disclosure of the offer's terms, and the rightholder has a subsequent duty to undertake a 'reasonable' investigation of any terms unclear to him. Further, this issue is governed by the established rule that [the rightholder] has the burden to prove all predicates to the contractual liability of the defendant." [6] (Citations omitted).

We agree with the principles stated in *Koch*, at least in cases where there is no specific language in the agreement granting the right of first refusal spelling out what must be contained in the notice. The primary purpose of the notice by the property owner is to provide the holder of the right of first refusal with sufficient information to determine whether he is interested in exercising the right. If there is some ambiguity in the terms set out in the notice, the proper recourse for the rightholder is to request additional information. Once such a request is made, the owner must respond or assume the burden of showing that the notice was reasonably accurate. If no such request is made by the rightholder and he rejects the offer, he may not later contest the reasonableness of the notice.

Here, Mr. Stump made no request for additional information indicating that the notice was incomplete or ambiguous. Instead, his response clearly indicated his intention not to accept the proposed offer. He rejected the $400,000 covenant not to compete, which was a part of the third party's offer, out of hand. He further conditioned his acceptance on his ability to obtain financing. Consequently, we conclude that, as a matter of law, Mr. Stump was foreclosed from seeking damages from the Smiths for their refusal to sell to him.

### III.

The Smiths also allege error with regard to the verdict on Mr. Stump's claim to unpaid commissions under the Agreement. The terms of the Agreement entitled Mr. Stump to be paid a 35 percent commission on all "authorized sales" of cemetery items. Paragraph 1 of the Agreement gave Mr. Stump "the exclusive right during the term of this agreement to sell pre-need cemetery items," while the Smiths were given the exclusive right to "at-need" sales.[7] Paragraph 1 also provided that a sale by the Smiths "during the term of this contract to any purchaser previously solicited by Contractor as a potential pre-need customer shall be deemed a sale by Contractor[.]" [8]

---

6. In a plurality opinion, the Supreme Court of Idaho stated that the holder of a right of first refusal "cannot be called upon to exercise ... that right unless the *entire* offer is communicated to him in such a form as to enable him to evaluate it and make a decision." *Gyurkey v. Babler*, 103 Idaho 663, 666, 651 P.2d 928, 931 (1982). *See also Hancock v. Dusenberry*, 110 Idaho 147, 715 P.2d 360 (App.1986).

7. At-need sales are defined in the Agreement as sales of cemetery items which occur within thirty days after the death of the person for whom the purchase is made. Pre-need sales are sales which occur in advance of the death of the party for whom the items are purchased.

8. The relevant language of Paragraph 1 is:
 "Contractor shall have the exclusive right during the term of this agreement to sell pre-need cemetery items ... owned by or to be supplied by Owner ... for use in ... Cunningham Memorial Park; except Owner reserves the right to sell pre-need selected cases reserved by it by giving notice of such intention to Contractor within seventy-two hours of first contact. At-need sales of said items are to be the exclusive right of Owner.... An at-need sale as used in this agreement is a sale of one or more of the foregoing cemetery items, made within the thirty day period immediately succeeding the death of the person for whom such purchase is made.... A sale by

The issue raised by the Smiths is whether "walk-in" pre-need sales, i.e., sales of pre-need items to customers who purchased from the Smiths directly without having been solicited by Mr. Stump, were sales upon which commissions had to be paid under the Agreement. The Smiths assert that the intent of the parties was to pay commissions to Mr. Stump only on pre-need sales obtained through the efforts of Mr. Stump and his staff. Consequently, the Smiths argue, Mr. Stump was not entitled to commissions on pre-need sales that Mr. Stump and his staff did not generate. Mr. Stump, however, asserts that the "exclusive right" language of the Agreement gave him the right to commissions on all pre-need sales, including walk-in sales.

The Agreement itself is silent as to the payment of commissions on walk-in pre-need sales, thus giving rise to an ambiguity. As evidence of the contractual intent of the parties, the Smiths rely on the provisions of the Agreement specifying that sales by the Smiths to customers previously solicited by Mr. Stump will be deemed to be sales by Mr. Stump. This language, they say, clearly indicates that unless Mr. Stump or members of his staff actually solicited the sale, a walk-in sale of pre-need items would be credited to the Smiths.

The evidence at trial was conflicting. William Smith testified that he told Mr. Stump at their first meeting that the Smiths would not pay commissions on walk-in pre-need sales and that Mr. Stump agreed. Mr. Stump testified that he told the Smiths he needed an exclusive pre-need sales agreement. Several of Mr. Stump's employees testified that Mr. Stump had told them no commissions were paid on walk-in pre-need sales. Mr. Stump's partner in the plaintiff corporation testified that commissions were to be paid on such sales. Mr. Stump testified that the Smiths failed to pay him for walk-in pre-need sales on a number of occasions, leading to arguments with the Smiths. Mr. Smith testified that in each instance a walk-in customer on a pre-need contract had previously been solicited by Mr. Stump, and the commission was paid as required under the contract.

We believe that in view of the contractual ambiguity and the conflicting evidence, the trial court was correct in submitting the question to the jury under the rule contained in Syllabus Point 1 of *Buckhannon Sales Co. v. Appalantic Corp.*, 175 W.Va. 742, 338 S.E.2d 222 (1985):

" 'While the general rule is that the construction of a writing is for the court; yet where the meaning is uncertain and ambiguous, parol evidence is admissible to show the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently. If the parol evidence be not in conflict, the court must construe the writing; but if it be conflicting on a material point necessary to interpretation of the writing, the question of its meaning should be left to the jury under proper hypothetical instructions.' Syl. Point 4, *Watson v. Buckhannon River Coal Co.*, 95 W.Va. 164, 120 S.E. 390 (1923)."

However, the Smiths also contend that the trial court erred in giving Plaintiff's Instruction No. 6.[9] The Smiths, at trial, objected to this instruction on the ground

Owner during the term of this contract to any purchaser previously solicited by Contractor as a potential pre-need customer shall be deemed a sale by Contractor; except telephone contacts by Contractor shall only be honored in this respect for one year from the date made."

9. Plaintiffs' Instruction No. 6 instructed the jury:

"With regard to the provision in the agreement dated November 1, 1983, granting plaintiffs the 'exclusive right' to sell pre-need ceme-tery products, you are instructed that the usual and ordinary meaning of the word 'exclusive' is synonymous with the words 'only' and 'sole'. An 'exclusive right to sell' vests in one person or one party alone the right to sell property and shuts out or prohibits all others, including the owner of the property, from selling the property in question. Further, under an exclusive sales agreement, there is an implied promise on the part of the owner to do nothing to hinder, interfere with, or obstruct the performance by the sales agent."

that it advised the jury as a matter of law that the word "exclusive" controlled the entire dispute over pre-need walk-in commissions, thereby foreclosing any jury consideration of the issue, the crucial controversy on the commission claim. This instruction was totally inconsistent with Defendant's Instruction No. 23, which dealt with the same issue, but left its resolution to the jury.[10]

We have traditionally held that the giving of inconsistent instructions is error. As we stated in Syllabus Point 2 of *Burdette v. Maust Coal & Coke Corp.*, 159 W.Va. 335, 222 S.E.2d 293 (1976):

> " 'It is error to give inconsistent instructions, even if one of them states the law correctly, inasmuch as the jury, in such circumstances, is confronted with the task of determining which principle of law to follow, and inasmuch as it is impossible for a court later to determine upon what legal principle the verdict is founded.' Opinion, *State Road Commission v. Darrah*, 151 W.Va. 509, 513, 153 S.E.2d 408, 411 (1967)."

*See Quality Bedding Co. v. American Credit Indemn. Co. of N.Y.*, 150 W.Va. 352, 145 S.E.2d 468 (1965); *Penix v. Grafton*, 86 W.Va. 278, 103 S.E. 106 (1920). We find the conflicting instructions below erroneous, and we reverse the judgment of the circuit court on that ground.

### IV.

Our resolution of the issues discussed above makes it unnecessary for us to address the numerous other issues raised by the parties in this appeal. For the reasons set out in Part II, the judgment in favor of Mr. Stump with respect to the pre-emptive right to purchase the cemetery assets is held to be improper as a matter of law and is reversed. The judgment with respect to the disputed sales commissions is reversed, and the case is remanded for a new trial on that issue.

Reversed and Remanded.

---

**10.** Defendant's Instruction No. 23, as amended, stated:

> "The Court instructs the jury that plaintiffs in this case claim that the agreement entered into by the parties to this lawsuit provided that plaintiffs are entitled to all of the commissions on all of the pre-need sales not specifically reserved by the Smiths, including all walk-ins, whether or not such walk-in sales were generated, in any manner, by plaintiffs' sales organization.
>
> "Defendants deny that the agreement gives plaintiffs all such commissions and contend that it was the intent of the parties that plaintiffs were to receive commissions on walk-in sales only if those sales were 'generated due to advertising, phone survey, presentation, or referral' by Mr. Stump's sales organization, as was proposed by Mr. Stump in his ... sales contract proposal.
>
> "You are instructed that unless you find that both parties intended for plaintiffs *to* receive all of the pre-need sales, including all walk-ins, except for those specifically reserved by the Smiths, then there was no meeting of the minds in this respect, and the plaintiff cannot recover commissions on any pre-need sales not generated by the Stump sales organization."