SEESSEL HOLDINGS, INC.; Arthur N. Seessel, III, Individually, as Trustee, and as Attorney-in-Fact; and Melville J. Seessel, Individually and as Attorney-in-Fact, Plaintiffs,

v.

FLEMING COMPANIES, INC. and Bruno's, Inc., Defendants.

No. 96–2620–GV.

United States District Court, W.D. Tennessee, Western Division.

Nov. 20, 1996.

Mark Vorder Bruegge, Jr., Wyatt, Tarrant & Combs, Memphis, TN, for plaintiff.

Melvyn L. Cantor, Simpson Thacher & Bartlett, New York City, Leo Bearman, Jr., Baker Donelson, Memphis, TN, for Bruno's, Inc.

DeWitt M. Shy, Jr., Burch Porter, Memphis, TN, for Fleming Cos.

## ORDER GRANTING PLAINTIFFS' AND DEFENDANT BRUNO'S MOTIONS FOR SUMMARY JUDGMENT

GIBBONS, Chief Judge.

Before the court are plaintiffs' and defendants' motions for summary judgment in this declaratory judgment action. The parties have stated their mutual belief that summary judgment is the appropriate method for resolution of this matter and that the only facts and documents material to the determination of the parties' motions are those set forth in the Stipulation, Appendix, and Exhibits submitted to the court. For the following reasons, plaintiffs' and defendant Bruno's motions for summary judgment are granted. Fleming's motion is denied.

The parties to this action have stipulated to the following facts and all others contained in their stipulation for expedited resolution of all claims.[1] On January 20, 1993, plaintiff Seessel Holdings, Inc. ("SHI") and defendant Fleming entered into a "Comprehensive Agreement" and an "Amendment and Restated Shareholder Agreement." Both agreements provide that they are governed by Tennessee law. These two agreements, in redundant terms, provide Fleming with a right of first refusal with respect to any agreement for the sale of SHI's capital stock to a third party. The pertinent provisions of the Shareholder Agreement, which restate virtually identical provisions in the Comprehensive Agreement, provide as follows:

SECTION 2.   First Refusal On Sale

2.1   Notice of Sale.   Upon the signing by SHI · ... of a binding or non-binding letter of intent or similar agreement of understanding providing for the ... sale or exchange by [plaintiffs' shareholders] of all their capital stock (other than in an inter-family transfer) in SHI, [Fleming] shall be provided written notice of such proposed sale or exchange....

2.2   First Refusal Right.   At any time within seven (7) calendar days after its receipt of the notice and information provided for above, time being of the essence, [Fleming] may, at its option, elect to pur-

chase the capital stock or assets which are the subject of such letter of intent, at the price and on the terms contemplated thereby.   Such election shall be made by delivery to SHI ... of written notice of its unconditional election within said 7–day period.   Any such election by [Fleming] shall be irrevocable....

2.3   Election Not to Purchase.   If [Fleming] does not timely exercise its rights provided for in Section 2.2 above, time being of the essence, such shall be conclusively deemed an election not to purchase ...

In early 1996, SHI solicited purchase offers from third parties, including defendant Bruno's. On May 23, 1996, plaintiffs signed an agreement with defendant Bruno's (the "Bruno's Agreement") for Bruno's to acquire the capital stock of plaintiff. The Bruno's Agreement was sent to Fleming that same day and was received on May 25, 1996. On May 31, 1996, SHI received a letter from Fleming dated May 30, 1996 stating the following:

[Fleming] does hereby unconditionally elect and agree to purchase all of the capital stock of SHI at the price and on the terms set forth in [SHI's May 23 transmittal of the Bruno's Agreement]. Please be advised that Fleming will prepare and enter into with you a stock purchase Agreement ... containing the same terms and conditions as forth in the [Bruno's Agreement].

Shortly after receiving this letter, SHI was advised that Fleming intends to assign the Fleming Agreement to an affiliate of Fleming and following closing, to transfer the equity ownership of the affiliate to Schnucks Markets, Inc. of St. Louis, Missouri.[2]

On June 4, 1996, SHI delivered to Fleming a draft of an agreement for Fleming to acquire SHI. This draft consisted of a copy of the Bruno's Agreement with various modifications which plaintiffs characterize as reflecting the fact that Fleming, rather than Bruno's, would be the purchaser. On June 6, 1996, Fleming delivered to SHI a letter and a

---

1.   In the stipulation, the parties also waive their right to appeal the decision of this court.

2.   Although not a party, Schnucks entered into the stipulations.

separate draft agreement for Fleming to acquire SHI. This draft agreement also consisted of a copy of the Bruno's Agreement with various proposed modifications. On June 10, 1996, Fleming and SHI exchanged correspondence regarding Fleming's willingness to change its draft agreement to eliminate perceived differences from the Bruno Agreement. On June 15, 1996, SHI received a revised agreement executed and transmitted by Fleming on June 14, and an explanatory letter from Fleming's counsel. SHI did not execute this agreement. Plaintiffs commenced this action on June 17, 1996.

The Bruno's Agreement, the draft agreement delivered by SHI to Fleming on June 4, and the agreement signed by Fleming on June 14, contain a section 7.4. In the Bruno's Agreement, this section is entitled "Investment Intent; Investigations by Purchaser", and its first sentence reads as follows:

> The Shares are being acquired hereunder solely for the account of Purchaser for investment for its own account and not with a view to the resale or distribution thereof.

In section 7.4 of the agreement delivered to SHI by Fleming on June 6, the term "Investment Intent" in the section title, and the sentence quoted above, were deleted. In section 7.4 of the agreement delivered to SHI by Fleming on June 15, the title from the Bruno's Agreement was restored and the corresponding sentence reads as follows:

> The Shares are being acquired hereunder solely for the account of the Purchaser for investment and not with a view to the resale or distribution thereof in a manner which would violate the federal or state securities laws.

Following commencement of this action, on July 3, 1996, Fleming sent a letter to SHI stating that Fleming "stands ready, willing and able, to consummate the purchase of the stock of SHI on the same terms and conditions contained in the Bruno's Agreement without the need for any additional documentation."

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The parties to this action have "unconditionally and irrevocably" stipulated to all the relevant facts. Additionally, all parties have agreed to resolve the action by summary judgment, and have provided the Court with a single, definitive, and exclusive record of the facts.

Resolving disputes concerning written contracts involves a two-step process. First, as a threshold matter, the court must determine whether the contract is ambiguous. This is a question of law. *Forde v. Fisk University*, 661 S.W.2d 883, 886 (Tenn.Ct.App.1983); *Shelby v. Delta Air Lines, Inc.*, 842 F.Supp. 999 (M.D.Tenn.1993), *aff'd* 19 F.3d 1434 (6th Cir.1994). If a contract's language is clear and unambiguous, the courts will interpret the contract according to its terms without going beyond the four corners of the agreement. *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn.1975).

If the contract is ambiguous, then the finder of fact must ascertain the parties' intentions. *Forde*, 661 S.W.2d at 886. Because the existence of an ambiguity and the construction of an unambiguous contract are purely legal issues, they are particularly suited for adjudication by summary judgment. Contract language is ambiguous when its meaning is uncertain or when it can be fairly construed in more ways than one. *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn.1975). The disputed language should be examined in the context of the entire agreement. *Cocke County Bd. of Highway Commrs. v. Newport Utils.*, 690 S.W.2d 231, 237 (Tenn.1985). The words should be given their usual, natural and ordinary meaning. *St. Paul Surplus Lines Ins. Co. v. Bishops Gate Ins. Co.*, 725 S.W.2d 948, 951 (Tenn.Ct.App.1986).

In the present case, two contractual issues must be addressed. First, under the Comprehensive Agreement and the Shareholder's Agreement, the court must determine the obligations of Fleming in exercising its right

of first refusal. Second, the court must decide whether Fleming effectively and irrevocably exercised its first refusal right. The court will address each issue in turn.

■ Defendant Fleming's contractual right of first refusal is expressly defined:

> At any time within seven (7) calendar days after its receipt of the notice and information provided for above, time being of the essence, [Fleming] may, at its option, elect to purchase the capital stock or assets which are the subject of such letter of intent, at the price and on the terms contemplated thereby.

The court finds this language to be completely unambiguous. Fleming must purchase the capital stock or assets on the *same* terms as offered to Bruno's.[3] This conclusion is supported by both the case law and the plain meaning.

Tennessee law concerning the exercise of rights of first refusal is unfortunately limited. The courts have not directly addressed the issues presented by this case. The Tennessee Court of Appeals has, however, explained the nature of the right of first refusal as follows:

> [The right of first refusal], although closely akin to an option, differs in that it does not give the holder the power to compel an unwilling owner to sell, but merely requires that when and if the owner decides to sell, he offers the property first to the holder of the right. Once the owner of the property is willing to accept a good faith offer, the [right of first refusal] ripens into an option, *governed by the terms set out in the initial agreement.*

*Sager v. Rogers,* 1987 WL 6718, at *2 (Tenn. Ct.App.1987) (emphasis added) (citing *Sports*

*Premiums, Inc. v. Kaemmer,* 595 P.2d 696 (Colo.App.1979); *Quigley v. Capolongo,* 53 A.D.2d 714, 383 N.Y.S.2d 935 (1976), *aff'd* 43 N.Y.2d 748, 401 N.Y.S.2d 1009, 372 N.E.2d 797 (1977)). Thus, Tennessee law governing the exercise of options is applicable to the present case.

■ Defendant Bruno's is correct in pointing out that, absent any agreement to the contrary, Tennessee law requires the strict matching of terms in order to exercise an option. *Bradford v. Crown–Bremson Indus., Inc,* 255 F.Supp. 1009, 1012 (M.D.Tenn.1964). *See also Pinney v. Tarpley,* 686 S.W.2d 574, 580 (Tenn.Ct.App.1984) (holding that acceptance of an option must be "unqualified, absolute, unconditional, unequivocal, unambiguous, positive, without reservation, and according to the terms of the option."); *Jones v. Horner,* 36 Tenn. App. 657, 260 S.W.2d 198, 199 (1953).

■ Predictably, other jurisdictions have imposed similar requirements on any attempt to exercise a right of first refusal by accepting the terms of a pre-existing offer. *See, e.g., Ollie v. Rainbolt,* 669 P.2d 275, 280–81 (Okla.1983); *John D. Stump & Assoc. v. Cunningham Memorial Park,* 187 W.Va. 438, 419 S.E.2d 699, 705 (1992); *West Texas Transmission, L.P. v. Enron Corp.,* 907 F.2d 1554, 1564 (5th Cir.1990), *cert. denied* 499 U.S. 906, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991); *McCulloch v. M & C Beauty Colleges, Inc.,* 194 Cal.App.3d 1338, 240 Cal. Rptr. 189, 194 (1987). Thus, the owner of the assets subject to the right of refusal remains master of the conditions under which he will relinquish his interest, as long as those conditions are commercially reason-

---

**3.** Fleming argues that to properly exercise its right of first refusal, only the material terms of the third-party offer need be met. This argument relies, in part, on § 2.2(a)(1) (the "Notice Provision") of the Stockholders Agreement. § 2.2(a)(1) requires that, along with notice of the third-party offer, SHI transmit to Fleming the "material terms" of that offer. A plain reading of this provision in the overall context of the contract indicates that this provision was only meant to specify which terms, at a minimum, would be included in the notice to Fleming. The fact that the Notice Provision may have only required a description of material terms does nothing to

alter the fact that the provision establishing the proper exercise of the first refusal right, and the governing law, require acceptance of the same terms.

Fleming also cites the 1996 Bruno's Agreement in support of its theory. The Bruno's Agreement included a provision providing that the Agreement would terminate if Fleming exercised its rights "on terms substantially the same ... and not more favorable in any material respect." The court finds the provision of the 1996 Bruno's Agreement to be irrelevant in determining the plain meaning of Fleming's 1993 contractual right of first refusal.

able, imposed in good faith, and not specifically designed to defeat preemptive rights. *See West Texas Transmission*, 907 F.2d at 1566. Furthermore, a right holder who agrees to meet the same terms and conditions as contained in a third-party offer must meet all of those terms, not just the material ones. *Id.* at 1564–65.

■ There are, however, two limited exceptions to the rule that the right of first refusal must be exercised strictly in accordance with the terms of the existing offer: (1) if a term has been deliberately imposed by the seller "to defeat the option," and (2) if modifications are necessary to take into account the different identity of the parties. *See, e.g., West Texas Transmission*, 907 F.2d at 1565–66. Thus, to effectively exercise its right of first refusal, Fleming must have accepted the outstanding offer within seven days on the same terms offered to defendant Bruno's, subject only to these two limited exceptions.

Fleming first received notice of the outstanding third-party offer on May 25 when it received SHI's copy of the Bruno's Agreement. On May 31, 1996, SHI received a letter from Fleming dated May 30, purporting to "unconditionally elect and agree to purchase all of the capital stock of SHI at the price and on the terms" of the Bruno's Agreement. On June 4, 1996, SHI delivered to Fleming a draft of an agreement for Fleming to acquire SHI.[4] On June 6, 1996, Fleming delivered to SHI a draft agreement in which the term "Investment Intent" in section 7.4's title, and the following sentence from the original Bruno's agreement were deleted:

> The Shares are being acquired hereunder solely for the account of Purchaser for investment for its own account and not with a view to the resale or distribution thereof.

On June 15, 1996, SHI received a revised agreement in which the title from the Bruno's Agreement was restored and the corresponding sentence reads as follows:

> The Shares are being acquired hereunder solely for the account of the Purchaser for investment and not with a view to the resale or distribution thereof in a manner which would violate the federal or state securities laws.

Following commencement of this action, on July 3, 1996, Fleming sent a letter to SHI stating that Fleming "stands ready, willing and able, to consummate the purchase of the stock of SHI on the same terms and conditions contained in the Bruno's Agreement without the need for any additional documentation."

■ Plaintiffs and defendant Bruno's argue that Fleming failed to validly exercise its first refusal right, regardless of its initial attempt at unconditional acceptance, by its subsequent attempts at modification and refusal to accept the terms of the Bruno's Agreement. In defense, Fleming argues that its May 30 unconditional election formed a irrevocable contract and that subsequent negotiations did not constitute a rejection or counteroffer. In the alternative, Fleming argues that its proposed investment representation, section 7.4, has the same meaning as the investment provision in the Bruno's Agreement and thus satisfies the "same terms" requirement.

■ As the court has previously concluded, a right of first refusal gives the holder the power to purchase the subject property or stock according to the terms of a pre-existing sales contract. The question remains, however, whether an initial unqualified acceptance of terms is effective by itself to bind the parties even where the option holder refuses to actually enter into a contract on those terms within the time period

---

4. SHI's draft included several modifications which Fleming characterizes as initiating negotiations. The court finds, however, that these modifications were simply an attempt to reflect the change in identity of the parties. For example, SHI modified the choice of law provision from New York to Tennessee law. Bruno's principal stockholder had been a New York resident, while all previous contracts between SHI and Fleming had included Tennessee choice of law provisions. Thus, SHI's modification of the choice of law provision simply reflected the status of the new purchaser, Fleming. Additional changes reflected the fact that while Bruno's had no previous ownership interest in SHI, Fleming already owned 27% of SHI's shares.

specified. The court holds that a purported acceptance made within the allotted time, followed by repeated attempts to renegotiate and refusals to enter a contract on the same terms as the third-party offer, is not an effective exercise of a party's rights of first refusal.

A right of first refusal will not permit a party to purport to accept the terms of the original offer and then refuse to execute an agreement on those terms. Indeed, because the exercise of a right of first refusal obligates a party to enter into and close a deal on the basis of a pre-existing offer, any attempt to renegotiate such terms is fundamentally inconsistent with the exercise of a first refusal right. As the Washington Court of Appeals explained in *Matson v. Emory*, 36 Wash.App. 681, 676 P.2d 1029 (1984):

> [A first refusal right] has been defined as entitling the owner of the right to the opportunity to buy the subject property on the same terms contained in a bona fide offer from a third party, acceptable to the property owner.... The right, however ... does not entitle the holder to set terms and conditions or negotiate the time and place of sale. If the right holder wants the privilege of negotiating terms or forcing a sale, those additional rights should be obtained through an option.

*Id.* 676 P.2d at 1031 (citations omitted). *See also Jones v. White Sulphur Springs Farm, Inc.*, 605 S.W.2d 38 (Ky.App.Ct.1980) (rejecting the argument that a binding contract arose immediately upon notification of the exercise of a right of first refusal according to the terms of the third-party offer where

subsequent negotiations ultimately resulted in modified terms).

■ Accordingly, where the right holder has proffered an alternative or substitute agreement, the issue of whether a right of first refusal has been properly exercised is not whether the right holder properly notified the parties of its intention to enter into a final contract. Merely electing to exercise a first refusal right is not sufficient if a right holder subsequently refuses to timely enter into a contract matching the terms of the third party agreement. *See, e.g., Green v. First Am. Bank & Trust*, 511 So.2d 569 (Fla.Ct.App.1987) (holding that the initial attempt to exercise an option was never valid because right holder never intended to match the third-party offer as evidenced, in part, by his subsequent refusal to meet the same terms)[5]; *Miller v. LeSea Broadcasting, Inc.*, 87 F.3d 224, 226 (7th Cir.1996); *West Texas Transmission*, 907 F.2d at 1567 n. 16; *White Sulphur*, 605 S.W.2d at 41. This rule applies even where evidence of a party's intent to reject the third-party agreement does not materialize until weeks or months after the original "acceptance." To hold otherwise would vitiate the power of the offeror as master of his offer, and nullify the time is of the essence provision (Shareholder's Agreement § 2.2).

■ Fleming, however, insists that its proposed investment representation has the same meaning as the investment provision in the Bruno's Agreement. Thus, the offer and acceptance, even considering the proposed modifications, were on the "same terms." A plain reading of the contract language requires rejection of Fleming's argument.[6]

---

5. Defendant Fleming characterizes the *Green* court's holding as resting solely on the court's interpretation of the right holder's initial election which the court found to be questionable. Fleming construes *Green* too narrowly. Although the court did question the language of the initial election, it also emphasized the fact that Green never intended to meet the terms of the original third party offer, as evidenced in part by his subsequent proposals. *Green*, 511 So.2d at 574. The trial court had originally found that, although Green had initially exercised the option, he "effectively negated or waived the valid exercise of the option" by submitting a proposed Agreement that did not match the original offer. *Id.* at 574–75. The *Green* court reached the same result through slightly different reasoning;

Green's lack of intent to match the offer rendered the exercise invalid, not Green's submission of the subsequent differing agreement.

6. Attempting to take the court beyond plain meaning analysis, Fleming argues that certain actions taken by SHI in response to Fleming's purported exercise of its first refusal right were, in effect, admissions that Fleming's right had been exercised properly and that the pending transfer to Schnucks would not be in breach of the contract. The court is not persuaded. SHI's subsequent "admissions" regarding its beliefs that Fleming had or had not properly exercised its first refusal right are largely irrelevant. The SHI conduct characterized by Fleming as admis-

The original Bruno's Agreement provided that the shares be purchased for investment on its own account and not for resale or distribution. The subsequent Fleming's drafts first deleted the provision, then reinstated the sentence while adding the phrase "in a manner which would violate the federal or state securities laws" and deleting the phrase "on its own account." Under a plain reading of the Bruno's Agreement, the purchaser could not resell or distribute the securities under any conditions. After Fleming's modifications, however, the purchaser would be able to resell or distribute the securities as long as the transaction conformed to federal and state law. This course of action is one Fleming still hopes to pursue.[7] The court necessarily concludes that the terms on which Fleming was willing to accept the offer were not the terms offered in the Bruno's Agreement.

■ In support of its theory that the terms, though facially inconsistent, did in practice mean the same thing, Fleming attempts to offer evidence of trade custom and usage. It is well settled law, however, that such evidence is a matter of fact. T.C.A. § 47–1–205(2) ("The existence and scope of such a usage [of trade] are to be proved as facts"). *See also Northern Pac. Ry. Co. v. U.S.*, 213 F.2d 366, 368 (8th Cir.1954); *Typographical Service, Inc. v. Itek Corp.*, 721 F.2d 1317, 1319 (11th Cir.1983); *Hellenic Inv., Inc. v. Kroger Co.*, 766 S.W.2d 861, 865 (Tex. Ct.App.1989). Because the parties did not stipulate to these facts, and the court is limited by the record before it, evidence of custom and usage is excluded from consideration.

Even if the court were to look beyond the plain meaning of the words themselves,

Fleming's own conduct demonstrates that the terms were not the same. *See Pinson & Assoc. Ins. Agency, Inc. v. Kreal,* 800 S.W.2d 486, 487 (Tenn.Ct.App.1990) ("The course of conduct of the parties is the strongest evidence of their original intent."). Fleming repeatedly refused to enter into an agreement containing the original Investment Intent provision, most likely because it questioned whether the provision would prohibit its intended transfer to Schnucks. Yet under the revised drafts proposed by Fleming, Fleming obviously believed it would be free to complete the transfer.

■ The court also notes that Fleming's sudden attempt in the face of pending litigation to cure this inconsistency by reasserting its willingness to unconditionally accept the terms of the Bruno's offer was ineffective. The seven day period in which to effectively exercise its right had long since passed. Fleming had already abrogated its right. Particularly as time was of the essence, Fleming could not revive its right. Fleming has not timely met the terms of its first refusal right, and thus SHI and defendant Bruno's are free to close their transaction.

IT IS SO ORDERED.

---

sions occurred prior to the conduct which indicated Fleming's intent not to agree on the same terms as contained in the Bruno's agreement. Thus SHI's conduct cannot properly be construed as an admission of the validity of Fleming's exercise of its right. Moreover, Fleming overlooks the fact that, even if both Fleming and Seessel *believed* that a new contract had been executed in compliance with Fleming's first refusal right, Bruno's could bring an independent action seeking the court's determination as to whether the first refusal right had in fact been executed according to the terms of the contract. *See Jones v. White Sulphur Springs Farm, Inc.,*

605 S.W.2d 38, 40 (Ky.Ct.App.1980) (holding that a third party contracting to purchase property subject to first refusal rights has a legal right to demand that the option be exercised in a proper manner) (citing *Coastal Bay Golf Club, Inc. v. Holbein,* 231 So.2d 854 (Fla.Ct.App. 1970)).

**7.** In requesting relief, defendant Fleming asks the court to find that the contemplated transaction between defendant Fleming and Schnuck's is not prohibited by the Bruno's Agreement.