# Scope of Treasury Department Purchase Rights with Respect to Financing Initiatives of the U.S. Postal Service

If the Treasury Department has declared its election to purchase a proposed U.S. Postal Service bond issue pursuant to 39 U.S.C. § 2006(a) prior to the proposed date of issuance and is pursuing good-faith negotiations towards such purchase as of such date, the USPS is not free to proceed with issuance of the bonds to other purchasers solely because Treasury has not completed purchase of the bonds within a 15-day period following USPS' initial notice of the proposed issue.

If, in the above circumstances, Treasury and the USPS are unable to negotiate mutually agreeable terms for purchase by Treasury within a commercially reasonable period of time following USPS' proposed date for the issuance of its bonds, then the USPS may proceed with the issuance of such bonds to other purchasers.

Treasury is not authorized to dictate or control the terms of the USPS offering, but it must be afforded a reasonable opportunity to reach mutually agreeable terms with the USPS when the original terms proposed by the USPS are unacceptable. That reasonable opportunity is not rigidly limited by the 15-day period for declaring an election to purchase.

October 10, 1995

MEMORANDUM OPINION FOR THE VICE PRESIDENT AND GENERAL COUNSEL
UNITED STATES POSTAL SERVICE
AND
THE GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

## I. Background and Summary

This memorandum responds to the U.S. Postal Service's ("USPS") request that this Office reconsider and rescind an opinion issued on January 19, 1993,[1] in which we responded to the Department of the Treasury's ("Treasury") request for an opinion regarding the statutory relationship between the USPS and Treasury with respect to USPS financing initiatives. In the 1993 opinion, we concluded that (1) under 39 U.S.C. § 2006(a), Treasury's failure to purchase a USPS bond issue prior to the scheduled date of sale on the market proposed by USPS does not relieve USPS of further obligation to negotiate with the Treasury towards agreeable terms of sale, or permit USPS to proceed with the market sale as originally scheduled, as long as Treasury has duly declared its "election" to purchase and continues to negotiate in good faith towards the purchase; and (2) the transfer of the proceeds of a bond offering by the USPS to a trustee for the purpose of having the trustee employ those proceeds to make and use investments to dis-

---

[1] *Authority of the Secretary of the Treasury Regarding Postal Service Bond Offering,* 17 Op. O.L.C. 6 (1993) ("1993 opinion").

charge outstanding USPS debt would require the prior approval of the Treasury under the provisions of 39 U.S.C. § 2003.

In response to arguments and representations made by USPS, and after giving written notice to Treasury, this Office has undertaken a reconsideration of its 1993 opinion.[2] We now reaffirm the conclusions reached in that opinion, with the following clarification. We conclude that, although Treasury's declared election to purchase a USPS offering may require USPS to negotiate with Treasury towards agreeable terms of sale even beyond the originally scheduled market offering date, USPS is not required to postpone the market sale indefinitely if Treasury has not purchased the offering after that date has passed. Rather, USPS is only obligated to negotiate with Treasury in good faith for a *commercially reasonable period of time*, under the circumstances presented by the proposed transaction, before proceeding with the sale.

## II. Analysis

The original opinion addressed two distinct issues, and both were resolved in favor of the position advocated by Treasury.

On the first issue, we conclude that this Office was correct in opining that, under 39 U.S.C. § 2003(c)-(d), Treasury's approval was required as a precondition to USPS placing the proceeds of its proposed bond offering with a trustee who would invest the proceeds in securities and use the investment return to discharge outstanding USPS debt. We find no basis for changing or revising the original opinion's analysis of this issue, and we hereby readopt and reaffirm that analysis.

However, there appears to be some basis for clarifying one particular aspect of that portion of the opinion interpreting Treasury's purchase rights under 39 U.S.C. § 2006(a). Specifically, our 1993 opinion suggested that the negotiations that could be invoked by Treasury's "election" to purchase the USPS bond offering were not subject to any time limitation, even when Treasury has not effected a purchase of the offering by the date originally scheduled by USPS for sale on the market. We now conclude that if such negotiations are conducted in good faith by USPS, yet are not concluded within a commercially reasonable period of time following the initially proposed offering date, USPS may proceed with the proposed offering notwithstanding Treasury's unconsummated election to purchase.

---

[2] Our reconsideration of the original opinion in this matter was initiated by a request from the USPS. The request was originally set forth in a letter dated May 4, 1993, from Mary S. Elcano, Vice President and General Counsel of the U.S. Postal Service, to Daniel Koffsky, Acting Assistant Attorney General, Office of Legal Counsel. By letter dated March 17, 1995, the USPS has consented to be bound by the final opinion to be issued by this Office in this matter. On the basis of that consent, we are proceeding with our reconsideration of the 1993 opinion.

## A. *Treasury Restraints on USPS Authority to Invest or Deposit Funds*

The first and easier issue concerns the restraints on the authority of USPS to invest or deposit moneys of the Postal Service Fund ("Fund") set forth in 39 U.S.C. § 2003. Section 2003(c) provides that if USPS determines there are Fund moneys "in excess of current needs," such funds may be invested in Government securities by and through the Secretary of the Treasury and, subject to the Secretary's prior approval, such excess funds may also be invested in non-Government securities. Section 2003(d) separately provides that the Secretary of the Treasury must pre-approve any "deposits" of Fund moneys in a Federal Reserve bank, a depository for public funds, or in "such other places" as the USPS and the Secretary "may mutually agree."

USPS proposed to place the proceeds of its bond refinancing with a trustee, who would then invest the funds in government securities (it is not disputed that the refinancing proceeds would constitute part of the Fund). The trustee would then use the principal and interest of those government securities to redeem approximately $2.6 billion in outstanding USPS debt (i.e., the debt being refinanced). Treasury contended that USPS could not place the bond proceeds with the trustee without Treasury's prior approval — which apparently would not be forthcoming — under the above-quoted provisions of 39 U.S.C. § 2003. USPS contends that neither § 2003(c) nor (d) applied to this proposed "in substance defeasance," on the theory that the investments made under the trustee arrangement would not constitute true investments because they were only an alternative mechanism for the repayment of debt; and on the further theory that placement of the funds with the trustee did not constitute a "deposit" within the meaning of 39 U.S.C. § 2003(d).

USPS' renewed argument that the statutory requirement for Treasury's handling or approval of Fund investments is inapplicable to these arrangements is unpersuasive and is adequately addressed in the original OLC opinion. The trustee's investment of the Fund moneys in government securities is clearly an investment for purposes of § 2003(c)'s restrictions, notwithstanding the participation of the trustee as an intermediary. *See Postal Reorganization Act—Investment of Excess Funds of the Postal Service*, 43 Op. Att'y Gen. 45, 47 (1977).[3] This investment arrangement is therefore subject to the requirements of 39 U.S.C. § 2003(c).

The additional argument that the initial "placement" of funds with a trustee is not a "deposit" within the meaning of § 2003(d), and therefore not subject to approval by Treasury, is also unconvincing. In this regard, we reject the USPS

---

[3] In his 1977 opinion construing the investment and deposit restrictions of 39 U.S.C. § 2003, the Attorney General emphasized that "the limitations in § 2003 are limitations on any general powers [of the USPS] insofar as they apply to the Fund." 43 Op. Att'y Gen. at 47. He further stated that "the authority to purchase Government Obligations, carefully described and carefully circumscribed in § 2003(c), is to the exclusion of any other authority in this regard." *Id.*

contention that the placement of funds with the trustee was not a deposit within the meaning of that section because the funds were not subject to free withdrawal by USPS as depositor. There is nothing in § 2003(d) that requires or indicates such a narrow interpretation of the term "deposit." Rather, that subsection broadly encompasses the deposit of Fund moneys not only in Federal Reserve banks or in "depositories for public funds," but also "in such other places and in such manner as the Postal Service and the Secretary may mutually agree." That expansive description demonstrates that § 2003(d) was intended to apply to virtually any disposition of Fund moneys, not merely to conventional bank-type deposits.

This conclusion is consistent with the broad interpretation of Treasury's authority under § 2003(d) reflected in the Attorney General's opinion in 1977, resolving a comparable dispute between Treasury and the Postal Service. In confirming that § 2003(d) imposed limitations on the general powers of the USPS in making dispositions of the Fund, the Attorney General stated:

> Thus, for example, § 2003(d), which authorizes the Postal Service to deposit moneys in the Fund in bank accounts with the approval of the Secretary, restricts any implicit authority to open accounts which the Service might otherwise have under the general provisions of the Postal Reorganization Act; *and it could not reasonably be argued that in addition to deposits made under this authority the Service might make Fund deposits anywhere else, without the Secretary's approval.*

43 Op. Att'y Gen. at 47 (emphasis added). The Attorney General's 1977 opinion reenforces our view that the purposely restrictive provisions of § 2003(d) should not be circumvented by an unduly narrow interpretation of the verb "deposit."

**B.** *Treasury Restraints on USPS Right to Sell Bonds*

The second issue is whether the USPS was entitled to proceed with a proposed market offering of USPS bonds when Treasury, within the 15-day pre-offering notice period required by 39 U.S.C. § 2006(a), had invoked (but not actually *exercised*) its right to purchase that offering. That section provides (emphasis added):

> At least 15 days before selling any issue of obligations under section 2005 of this title, the Postal Service shall advise the Secretary of the Treasury of the amount, proposed date of sale, maturities, terms and conditions, and expected maximum rates of interest of the proposed issue in appropriate detail and shall consult with him or his designee thereon. *The Secretary may elect to purchase such obligations under such terms, including rates of interest, as*

*he and the Postal Service may agree,* but at a rate of yield no less than the prevailing yield on outstanding marketable Treasury securities of comparable maturity, as determined by the Secretary. *If the Secretary does not purchase such obligations, the Postal Service may proceed to issue and sell them to a party or parties other than the Secretary* upon notice to the Secretary and upon consultation as to the date of issuance, maximum rates of interest, and other terms and conditions.

USPS argues that even if Treasury has declared its "election" to purchase the offering, and negotiations to reach an agreement on terms have been undertaken, the only way Treasury can prevent USPS from proceeding on schedule with the proposed market offering is by completing the *actual purchase* of the offering (and not through mere continuation of good-faith negotiations) before expiration of the 15-day advance notice period. In contrast, Treasury has contended that it has an "absolute right of first refusal" with respect to the proposed offering and, once it has given notice of its "election" to purchase within the 15-day period, USPS is barred from proceeding with a market sale of the bonds and must continue to pursue negotiations with Treasury — if necessary, beyond the initially proposed offering date.

Our original opinion (1) rejected the USPS argument that nothing less than actual purchase of the offering by Treasury could prevent USPS from proceeding with the scheduled offering; (2) determined that the statute does not require Treasury to have agreed on terms with USPS *before* exercising its election to purchase and enables Treasury to require USPS to bargain exclusively with Treasury even beyond the date originally proposed for the offering; and (3) indicated that "[t]here is no limit on the negotiation period" that is implicitly required by the statute once Treasury has stated that it "elect[s] to purchase" the offering. 17 Op. O.L.C. at 7, 9–11.

We reaffirm conclusions (1) and (2) and again reject the USPS argument that Treasury's priority purchase right under 39 U.S.C. § 2006(a) automatically expires if Treasury's election to purchase does not result in the completion of negotiations and consummation of the purchase by the proposed sale date.

On this point, we have again considered USPS' contentions that certain legislative history underlying the Federal Financing Bank Act of 1973, Pub. L. No. 93–224, 87 Stat. 937 (1973) ("FFBA") confirms the USPS argument that Treasury must complete (as opposed to merely initiating) the purchase of a proposed USPS debt offering within 15 days after receiving first notice of the offering, or waive all purchase rights. In particular, USPS cites language from committee reports on the FFBA stating that "the Secretary of the Treasury may purchase all Postal Service obligations if he does so within the time period prescribed in 39 U.S.C. 2006(a)." H.R. Rep. No. 93–299, at 5 (1973), *reprinted in* 1973 U.S.C.C.A.N.

3153, 3157 ("PRA House Report"). Although this argument is not without force, we do not find it sufficiently persuasive to alter our conclusion on this point.

First, observations in committee reports concerning the FFBA simply do not provide persuasive legislative history for purposes of the Postal Reorganization Act, Pub. L. No. 91–375, 84 Stat. 719 (1970) ("PRA"). The FFBA was enacted three years after the PRA and concerned a more comprehensive range of federal agency financing issues. It is well-settled that the pronouncements of a subsequent Congress do not constitute reliable evidence of the intent or understandings of a prior Congress. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980); *United States v. Price*, 361 U.S. 304, 313 (1960). We are not persuaded that this sound general principle should be disregarded in interpreting the PRA.

Second, the committee report on the FFBA was not concerned with the discrete issue raised here — whether Treasury must merely initiate, or actually effectuate, the purchase of a USPS offering within the 15-day initial notice period — as opposed to the broader question of whether the USPS would retain "independent financing authority" after enactment of the FFBA. The segments of the FFBA committee reports in question were intended to provide broad assurance that the FFBA would not unduly impair USPS' existing financing authority under the PRA, and thus presented a broad interpretation of that authority. These post-enactment descriptions of § 2006(a) simply cannot be equated with a contemporaneous and authoritative explication of the section's provisions by the Congress that enacted it.

Third, the excerpts from the FFBA legislative history themselves contain an element of ambiguity on the matter in dispute. Although the segment quoted above would support the USPS contentions, it is followed by the following additional statement:

> However, if the [Federal Financing] Bank or the Secretary [of the Treasury] did not *act to take up* a proposed Postal borrowing within the prescribed time limit [provided in 39 U.S.C. 2006(a)], the Postal Service could, on its own initiative, borrow in the private market under its independent Postal Reorganization Act authority.

PRA House Report at 5, *reprinted in* 1973 U.S.C.C.A.N. at 3157–58 (emphasis added). Treasury's declaration of an election to purchase can certainly be viewed as "act[ing] to take up" the proposed obligations, even when the purchase has not been fully consummated. That phrase connotes the initiation of the purchasing process. Consequently, even the FFBA committee report highlighted by USPS does not unambiguously support its interpretation of § 2006(a).

Finally, and most importantly, the text of § 2006(a) strongly indicates that its drafters contemplated that Treasury would sometimes find it necessary to negotiate

modified terms to govern the proposed issue *after* Treasury has declared its election to purchase. Thus, the section specifically provides:

> The Secretary may elect to purchase such obligations *under such terms, including rates of interest, as he and the Postal Service may agree*, but at a rate of yield no less than the prevailing yield on outstanding marketable Treasury securities of comparable maturity, as determined by the Secretary.

39 U.S.C. § 2006(a) (emphasis added). If the section required Treasury to *consummate* its purchase option within 15 days after initial notice, USPS could easily frustrate the statute's provision for purchase by Treasury at *negotiated* terms that may sometimes differ from those originally proposed by USPS. It could do so by simply refusing to budge in any respect from its original terms during the 15-day period following initial notice. We do not believe that Congress intended to circumscribe Treasury's purchase options to that degree in enacting § 2006(a).

However, we modify our prior opinion insofar as it indicates that Treasury may delay the USPS offering *indefinitely* with unlimited negotiations once it has stated its election to purchase. We conclude that such negotiations cannot be prolonged beyond USPS' scheduled market offering date to such an extent as to impair substantially USPS' capacity to consummate the proposed offering in a timely fashion; rather, Treasury's option to purchase must be consummated within a commercially reasonable period of time.

Enabling Treasury to force an indefinite delay in a proposed USPS bond offering — even when it has not bound itself to purchase the offering on the terms proposed by USPS or on any other specified terms by the scheduled date of sale — appears inconsistent with the statute's intent to provide USPS with a significant degree of business freedom and to prevent Treasury from exercising a blanket veto over USPS financial offering proposals. Thus, the House Report on the PRA emphasized that Treasury's authority under § 2006(a) did not extend to preventing USPS from borrowing and did not include "any inappropriate power . . . to control the scale of Postal Service operations." H.R. Rep. No. 91–1104, at 21 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3649, 3669 ("House Report").

In other commercial contexts, courts have established that a purchase option or right of first refusal [4] (which was Treasury's description of the rights granted to it under the statute) must be exercised within a "commercially reasonable" period of time. *E.g., Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City*, 674 F.2d 1001, 1007 (3d Cir. 1982) ("in these circumstances the right of first refusal lasts for a commercially reasonable time"); *West Texas Transmission*,

---

[4] In a portion of our 1993 opinion, we used the term "right of first refusal" as a shorthand label for one of the three possible readings that might be applied to Treasury's purchase rights under § 2006(a). 17 Op. O.L.C. at 9. Here, we use the term in its general commercial sense rather than in the narrower sense in which we employed it in the 1993 opinion to describe a particular interpretation of § 2006(a).

*L.P. v. Enron Corp.*, 907 F.2d 1554, 1562 (5th Cir. 1990), *cert. denied*, 499 U.S. 906 (1991); *Brauer v. Hobbs*, 391 N.W.2d 482, 486 (Mich. Ct. App. 1986). In the absence of contrary language in the statute, this well-established commercial principle provides a relevant consideration in construing the purchase rights incorporated in § 2006(a).

We do not think the statute was intended to enable Treasury to prevent USPS from proceeding with a proposed bond offering by requiring USPS to submit to an indefinite and unlimited period of negotiations. Such power would constitute the kind of "inappropriate power in the Treasury to control the scale of Postal Service operations" that was foresworn in the legislative history. *See* House Report at 21, *reprinted in* 1970 U.S.C.C.A.N. at 3669.

If Treasury's ability to delay the proposed USPS offering date for purposes of negotiating agreeable purchase terms is limited to a commercially reasonable period, however, it would not be inordinate or inappropriate.[5] Although we cannot project a specific period or time-range that would be "reasonable" for the varying circumstances that USPS might confront in the future, we believe that a delay of such length as to substantially alter the circumstances which established the premises of the originally proposed offering would generally be considered unreasonable. Generally accepted custom and practice in the government securities sector would provide an appropriate point of reference for determining commercially reasonable timeframes in this context.

In summary, our conclusions regarding Treasury's purchase rights under 39 U.S.C. § 2006(a) are as follows:

1. If Treasury has declared its election to purchase the proposed issue before the proposed sale date, and Treasury is still pursuing good-faith negotiations towards mutually agreeable terms, the USPS is not free to proceed with a sale on the market merely because Treasury has not completed the purchase within the 15-day period following initial notice of the proposed sale.

2. Treasury may not frustrate USPS' right to sell the obligations elsewhere *for an indefinite period* by declining to purchase at the originally proposed terms when good-faith negotiations have failed to produce mutually agreeable alternative terms. If Treasury and USPS are unable to negotiate mutually agreeable terms within a commercially reasonable period of time following the originally proposed sale date, USPS may proceed to sell to another purchaser.

3. Treasury is not authorized to dictate or control the terms of the USPS offering, but it must be afforded a reasonable opportunity to reach mutually agreeable terms with USPS when the original terms proposed by USPS are unaccept-

---

[5] This interpretation is consistent with then Under Secretary of the Treasury Paul Volcker's testimony during the Senate hearings on the PRA, where he stated that the provisions in question would give the Secretary the authority "to supervise the timing of the financing and the terms of any financing by the postal authority, but he can never put himself in a position where he is preventing the postal authority from obtaining what financing they think is necessary." *Postal Modernization: Hearings Before the Senate Comm. on Post Office and Civil Service*, 91st Cong. 311 (1969).

able. That reasonable opportunity is not rigidly limited by the 15-day period for declaring an election to purchase.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*